Laramore, Judge,
delivered the opinion of the court;
This is an appeal from an interlocutory order of the Indian Claims Commission (hereinafter referred to as the Commis *331 sion), entered January 12,1962, wherein the Commission determined the boundaries of the area of land in which the Medawakanton Band of Sioux Indians (hereinafter referred to as the Sioux), had a compensable interest as of September 29,1837. The appeal is directed to the exclusion by the Commission of approximately 800,000 acres from the area ceded by the Sioux to the United States by the Treaty of September 29,1837 (7 Stat. 538).
The Commission held that the Sioux had recognized title to the area ceded but ruled that the aforementioned 800,000 acres were not a part of the cession.[1] Finding 35, 10 Ind. Cls. Comm. 159, 186-7.
The Commission’s exclusion of the 800,000 acres turned on its concept of the location of the eastern boundary of the 1837 cession. The appellants relied on the delimitation of the 1837 cession as shown by Royce in Indian Land Cessions in the United States, H. R. Doc. No. 736, 56th Cong., 1st Sess. (1899), Bureau of American Ethnology, 18th Annual Report. The Commission found that Royce had “not accurately depicted” the line and substituted a straight line, thus cutting off approximately the eastern one-fifth of the cession as shown by Royce. The area excluded by the Commission is hereinafter referred to as the “Black River Area.” The basis for the Commission’s finding was that the language of Article 5 of the Treaty of Prairie du Chien of 1825 (7 Stat. 272), delineating the eastern boundary of the Sioux, was clear and unambiguous. Finding 35,10 Ind. Cls. Comm. 137, 159. The Commission then determined that on the evidence presented the Sioux did not have aboriginal title to said area by reason of exclusive use and occupancy from time immemorial until the date of the cession in 1837. Finding 38,10 Ind. Cls. Comm. 137, 160.
Two questions are presented by this appeal: First, whether the Commission was correct in its finding that the Black Biver Area was not included in the definition of Sioux coun *332 try under the Treaty of 1825, supra. Second, whether the judgment of the Commission that the Sioux did not own the Black River Area by Indian title was supported by the findings and by substantial evidence.
The appellants first contend that the Black River Area was a part of the Sioux country defined and recognized by the 1825 Treaty heretofore alluded to. Secondly, appellants claim aboriginal title to said area.
Appellee, on the other hand, contends that the Commission was correct in its interpretation of Article 5 of the Treaty of 1825, and that there is substantial evidence to support the Commission’s finding that the Sioux did not have Indian title to the Black River Area.
We need not decide the question whether the finding of the Commission that the Sioux did not have aboriginal title is supported by substantial evidence, since we hold that as a matter of law the Commission erred in interpreting Article 5 of the Treaty of 1825, and that the area in question is defined and recognized as part of the Sioux country by said treaty.
In making its determination that Article 5, delineating the eastern boundary of the Sioux, excluded the Black River Area in its definition of Sioux country, the Commission stated that “the language is clear and unambiguous in this regard.” We disagree.
Article 5 of the 1825 Treaty in pertinent part provides:
* * * The eastern boundary of the Sioux commences opposite the mouth of Ioway river, on the Mississippi, runs back two or three miles to the bluffs, follows the bluffs, crossing Bad axe river, to the mouth of Blade river, and from Blade river to half a day’s march below the Falls of the Chippewa River, [emphasis added] 7 Stat. 272, 273 (1825).
The Commission determined that the language of Article 5 clearly meant that the line commences at the mouth of Black River and follows a straight line from the mouth of Black River to the terminal point below Chippewa Falls. But it is noted that Article 5 does not read “and from the mouth of Black river to * * A careful reading of the article in question clearly indicates that there is an am *333 biguity regarding tbe point on the Black River from which the eastern boundary of the Sioux runs to the terminal point below Chippewa Falls. Thus, Article 5, contrary to the Commission’s finding, is not clear or unambiguous.
In this posture, we believe it necessary to first review the history and purpose of the 1825 Treaty in an effort to determine the intent thereof. We say this in the light of the Supreme Court’s opinion in the case of United States v. American Trucking Association, 310 U.S. 534 (1940), wherein the Court stated, at pages 543-544:
* * * When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one “plainly at variance with the policy of the legislation as a whole” this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no “rule of law” which forbids its use, however clear the words may appear on “superficial examination.” [Footnotes omitted.]
A determination of the intent of the Treaty is in harmony with this court’s opinion in The Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725, 740; 281 F. 2d 202, 210-211 (1960), cert. denied, 366 U.S. 924, wherein the court stated:
We must seek to give this treaty provision a meaning which will give effect to all of its language. “It is a rule, in construing treaties as well as laws, to give a sensible meaning to all their provisions if that be practicable.” Geofroy v. Riggs, 133 U.S. 258, 270, 10 S. Ct. 295, 298, 33 L.Ed. 642. “Now, it is the duty of courts of justice so to construe all statutes as to give full effect to all the words in their ordinary sense, if this can properly be done; and thus to preserve the harmony of all the provisions.” Bend v. Hoyt, 13 Pet. 263, 272, 10 L.Ed. 154. All words of a statute are to be taken into account and given effect if that can be done consistently with the plainly disclosed legislative intent. McDonald v. Thompson, 305 U.S. 263, 266, 59 S. Ct. 176, 83 L.Ed. 164.
The Treaty of August 19, 1825, commonly called the “Treaty of Prairie des Chiens” or “Prairie du Chien,” was *334 the result of continuous warfare among the tribes of the Upper Mississippi region. The warring tribes were assembled at Prairie des Chiens and a treaty was entered into establishing boundaries among them in an attempt to remove the cause of their hostilities. The preamble of the treaty clearly bears this out:
The United States of America have seen with much regret, that wars have for many years been carried on between [the different tribes who were parties to the treaty] * * *. In order, therefore, to promote peace among these tribes, and to establish boundaries among them * * *, and thereby to remove all causes of future difficulty, the United States have invited [the different tribes who were parties to the treaty] * * * to assemble together, and in a spirit of mutual conciliation to accomplish these objects * * *.
Thus it can be seen that the purpose of the treaty was to promote peace by establishing boundaries among the tribes “* * * and thereby to remove all causes of future difficulty * * This objective appears not only in the preamble of the treaty, but in the statute appropriating funds for making the treaty,[2] in the instructions to the treaty commissioners, General William Clark and Governor Lewis,[3] in General Clark’s explanation made to more than 1,000 Indian representatives present at the treaty negotiations,[4] and in President Adams’ message transmitting the treaty to the Senate.[5]
*335 To carry out the treaty objective of peace, the tribes agreed with each other and the United States on boundaries. This was accomplished over a period of 14 days during which each tribe identified its claim of country. Conflicting claims were compromised and final lines fixed. It should be pointed out here that only the Sioux seriously claimed the territory in question.
The final agreements of the various tribes concerning the boundaries were set forth in separate articles in the 1825 Treaty. Taken together with the supplemental treaties of 1826, 1827, and 1830, respecting Indian tribes not present at the 1825 Treaty negotiations, they define the respective countries of the seven tribes.
We can find nothing in the historical background of the treaty that suggests other than that the intent of the United States, and that of the various Indian tribes assembled, was to carve the entire territory so as to give each tribe title to the lands claimed. It was a treaty of recognition; it defined the country of the respective Indian tribes; it was not a treaty of cession. Yet, under the construction adopted by the Commission, the Black River Area was not allocated to any tribe. The Commission’s result runs contrary to the avowed purpose of the treaty. We say this because when parties get together for a declared purpose, it is presumed that they carry out their intention. Thus, when the Indian tribes assembled at the instance of the United States to carve the entire territory among themselves, they are deemed to have accomplished their objective, absent clear proof to the contrary. Here, there is none.
It is significant that in those instances where the parties intended to exclude land from allocation to the tribes, explicit language to that effect was used in the 1825 Treaty. For instance, under Article 10, the tribes and the United *336 States agreed that three Government reserves, two town-sites, and a reservation for the Sac and Fox halfbreeds were not claimed by the tribes and thus were excluded from the country allocated to the tribes. If the intent had been to exclude the Black Biver Area, similar language of disclaimer could be expected.
The 1825 Treaty was not only designed to partition the entire territory among the assembled tribes, but also had as its purpose, by the establishment of boundaries, to insure and promote peace among the tribes. Under these circumstances, it was essential that the several Indian tribes know the extent of their territory, for Article 13 of the 1825 Treaty made it a violation to cross over into another’s country without the consent of that tribe. Traditionally, in these treaties, boundaries were fixed by the use, where possible, of natural markers such as rivers, forest areas, prairies, etc., so that the Indian could clearly discern where his territory ended and that of the neighboring tribe began. In his opening remarks, General Clark advised the Indians that their hostilities resulted in great measure from having no defined boundaries which led them to follow the game into lands claimed by other tribes. He explained that the remedy for this cause of hostility was the establishment of boundaries “which shall be known to you.” The Commission’s interpretation of Article 5, resulting in a straight line between the mouth of Black Biver to its terminal point below the falls does not depict a boundary line “which shall be known to you,” since this line runs through territory void of natural markers. Moreover, the Commission’s interpretation does violence to one of the avowed objectives of the treaty; i.e., according to the Commission’s interpretation, in a treaty planned and phrased to wipe out territorial ambiguities in order to prevent hostilities, an 800,000 acre “no man’s land”, as established, constituted a fresh area of potential conflict.
More significant, however, is the fact that each time Article 5 fixed a boundary by a straight line, it did so specifically. For example:
* * * thence in a straight line to the mouth of the first river which enters the Mississippi on its west side above the mouth, of Sac river; * * *
*337 thence in a direct line to a lake at the head of Prairie river, which is supposed to enter the Crow Wing river on its South side; * * *
thence in a direct line, so as to strike Buffalo river, half way from its source to its mouth, and down the said river to Red River; * * *. [emphasis added]
However, in this instance, no straight line is designated as the eastern boundary of the Sioux as the Commission’s interpretation would require.[6] The treaty merely states “ * * * to the mouth of Black river, and from Black river to half a day’s march below the Falls of the Chippewa River.”
Under these circumstances, we must find that since the language of Article 5 delineating the eastern boundary of the Sioux is not clear and unambiguous, the Commission’s conclusion is at variance with the treaty’s objective as a whole. Thus, we must hold that it was the treaty’s intent to fix the Black River as the eastern boundary of the Sioux.[7] This conclusion is fortified by the fact that Article 6 of the 1825 Treaty, delineating the southern boundary of the Chippewas, retraces the eastern boundary line of the Sioux, as interpreted herein by this court, taking as its starting point the terminal point of Article 5.
We are compelled to this view for a number of other reasons: (1) Only the Sioux seriously claimed the territory in question; (2) the boundaries of the Chippewa on the north, the Winnebago on the east, and the boundaries of the Menominee, which were not contiguous thereto, were all fixed. No buffer zone was either mentioned in the treaty negotiations or the treaty itself and obviously none was contemplated; (3) the United States in obtaining a cession of the territory in question never dealt with any but the Sioux; (I) the Sioux controlled the cutting and movement of timber in the area; *338 (5) the Black River provided the Indians a boundary line which was cognizable to them. All this leads us to the firm belief that the 1825 Treaty was designed to divide the territory in its entirety. Moreover, General Clark’s opening remarks, quoted supra, make it clear that the entire territory was to be divided.
To now say that the treaty intended to leave a hole in the center of Indian country is, we believe, contrary to the policy, objectives, and text of the 1825 Treaty.
CONCLUSION
The interlocutory order of the Commission, dated January 12, 1962, wherein the Commission excluded the Black River Area from Sioux country, is reversed, and the case is remanded to the Commission with instructions to amend its interlocutory order to include the Black River Area as part of Sioux country ceded by the 1837 Treaty.

 Appellants in their appeal brief have misconstrued the Commission’s findings with regard to an area south of the mouth of Black River. They contend that the Commission’s conclusion also excluded this territory. However, appellee points out that said territory, as determined by the Commission, was part of Sioux country. Appellants in their reply brief agree with appellee’s interpretation.

 Act of March 3, 1825, 4 Stat. 92, 93.

 Letter from the Secretary of War, James Barbour, to General William Clark, dated March 11, 1825 (National Archives, Indian Office L.S. 1825 Letter-book, Vol 1, pp. 400-401).

 General Clark, aften assuring the assembled tribes that the United States was not seeking any of their lands, stated the real purpose of this treaty council as well as the objectives to be accomplished, as taken from the following excerpts of his opening remarks:
“Your Great Father has been informed that war is carried on among his red children. The Sacs, Foxes, and Chippewas on the one side and the Sioux on the other; and that the wars of some of you, began before any of you now living were born * * *.
“* * * Your Great Father has heard of your war songs and of your war parties. They do not please him. He desires that his red children should bury the Tomahawk and he has sent us here to inform you what are his wishes * * *.
“Your hostilities have resulted in great measure from youn having no defined boundaries established in your country. Your tribes do not know *335 what belongs to them and your people thus follow the game into lands claimed by other tribes.
“This canse will be removed by the establishment of boundaries which shall be known to you and which boundaries we must establish at this council fire*
“We therefore propose to you to make peace together and to agree upon fixed boundaries for your country within which each tribe should hunt and over which others shall not pass without their consent.” [1825 Treaty Journal]

 American State Papers, Indian Affairs, Vol. 11, p. 608.

 Similar language is used throughout the entire treaty; U.g., in Article 2: “* * * thence crossing the fork of Red Cedar River, in a direct line to the second or upper fork of the Desmoines river; and thence in a direct line to the lower fork of the Calumet river; * * [emphasis added]

 It is interesting to note that in the case of Winnebago Tribe v. United States, 8 Ind. Cls. Comm. 78 (1959), the Commission agreed with Royce and found that the Black River was the eastern boundary of the Sioux and “the common boundary line” between Sioux and Winnebago.