391 F.2d 614
 CITIZEN BAND OF POTAWATOMI INDIANS OF OKLAHOMA, and Potawatomi Nation Represented by Citizen Band of Potawatomi Indians of Oklahoma et al., the Potawatomie Nation of Indians, the Prairie Band of the Potawatomie Nation of Indians et al.,
v.
The UNITED STATES.
 Appeal No. 6-65.
 United States Court of Claims.
 April 14, 1967.
 Certiorari Denied January 15 and March 4, 1968.
 See 88 S.Ct. 771, 1046.
 
 Louis L. Rochmes, Washington, D. C., attorney of record for appellant Citizen Band, etc.
 Robert S. Johnson, Washington, D. C., attorney of record for appellant Prairie Band, etc.; Howard D. Moses, Chicago, Ill., and Giddings Howd, Englewood, N. J., of counsel.
 Robert C. Bell, Jr., New York City, attorney of record for Hannahville Indian Community, etc., intervenor; Walter H. Maloney, Sr., Washington, D. C., of counsel.
 Frank De Nunzio, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for appellee.
 Before COWEN, Chief Judge, REED, Justice (Ret.) sitting by designation, and LARAMORE, DURFEE, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 NICHOLS, Judge.
 
 
 1
 This case involves, as its controlling issue, the interpretation of a treaty entered into on August 24, 1816 (7 Stat. 146), between the United States and "the chiefs and warriors of the united tribes of Ottawas, Chipawas, and Pottowotomees, residing on the Illinois and Melwakee rivers, and their waters, and on the southwestern parts of Lake Michigan," hereinafter referred to as the United Nation.
 
 
 2
 The United Nation's present successors[1] claim additional compensation for land ceded to them under the above treaty and receded by them to the United States under a later treaty of July 29, 1829 (7 Stat. 320). We must consider here what rights the United States reserved, and did not convey to the Indians, under the Treaty of 1816. The lands involved are located in northern Illinois and southwestern Wisconsin. For convenience we will refer to these cessions by the tract number used by Royce on his Illinois and Wisconsin Land Cession published in the 18th Annual Report of the Bureau of America Ethnology for 1896-97.[2]
 
 
 3
 Said areas are known and described as (1) Royce Area 147 on Royce Maps Wisconsin 1, Illinois 2, and (2) Royce Area 148, Illinois 2, and are more particularly described as follows:
 
 
 4
 Beginning at the Winnebago Village, on Rock river, forty miles from its mouth, and running thence down the Rock river, to a line which runs due west from the most southern bend of Lake Michigan to the Mississippi river, and with that line to the Mississippi river opposite to Rock Island; thence, up that river, to the United States' reservation at the mouth of the Ouisconsing; thence, with the south and east lines of said reservation, to the Ouisconsing river; thence, southerly, passing the heads of the small streams emptying into the Mississippi, to the Rock River aforesaid, at the Winnebago Village, the place of beginning. And, also, one other tract of land, described as follows, to wit: Beginning on the Western Shore of Lake Michigan, at the northeast corner of the field of Antoine Ouitmette, who lives near Gross Pointe, about twelve miles north of Chicago; thence, running due west, to the Rock River, aforesaid; thence, down the said river, to where a line drawn due west from the most southern bend of Lake Michigan crosses said river; thence, east, along said line, to the Fox River of the Illinois; thence, along the northwestern boundary line of the cession of 1816, to Lake Michigan; thence, northwardly, along the Western Shore of said Lake, to the place of beginning.
 
 
 5
 A treaty was entered into by and between the defendant herein, the United States, and the chiefs and headmen of the United Sac and Fox Tribe, dated November 3, 1804 (7 Stat. 84), wherein the United Sac and Fox Tribe ceded to the United States the land making up Royce Area 50 (which, among others, includes Areas 147 and 148). Subsequently, the United States entered into the treaty dated August 24, 1816, with the United Nation, wherein the United States recognized title in the United Nation to part of the land contained in the cession of the Treaty of 1804. Said lands were described in Article 2 of the Treaty of 1816, the provision in question as follows:
 
 
 6
 * * * all the land contained in the aforesaid cession of the Sacs and Foxes, which lies north of a due west line, from the southern extremity of Lake Michigan to the Mississippi river, except three leagues square at the mouth of the Ouisconsing [the "Ouisconsing" is the present Wisconsin River] river, including both banks, and such other tracts, on or near to the Ouisconsing and Mississippi rivers, as the president of the United States may think proper to reserve: Provided, That such other tracts shall not in the whole exceed the quantity that would be contained in five leagues square.
 
 
 7
 The United States, by reason of the Treaty of 1816, recognized title, subject to the above reservation, in the United Nation as to Royce Area 147 and Royce Area 148, excepting the area herein described as 148-A, which is that portion of Royce Area 148 lying east of the Fox River in Illinois. However, from a time long prior to the United States' acquisition of Area 148, until ceded by the Treaty of July 29, 1829, the United Nation had original Indian title to Area 148-A. Therefore, at the time of the Treaty of 1829 the United Nation had title to all of Royce Areas 147 and 148.
 
 
 8
 The Indian Claims Commission found that the sum of $364,901 was the treaty date value of the consideration for the cession made by the United Nation under the 1829 Treaty, that this sum was so grossly inadequate an amount for the lands involved as to make the consideration unconscionable, and concluded as a matter of law that the United Nation was entitled to recover from the defendant the sum of $2,407,264.30, less the sum of $364,901.00, representing the consideration paid by the United States for the 1829 cession and less the sum of $10,790.28, representing allowable gratuitous offsets, leaving a net balance of $2,094,573.02 owed by the defendant. 11 Ind. Cl.Comm. 693 (November 29, 1962), as amended by order entered April 15, 1965, 15 Ind.Cl.Comm. 232. The United Nation contends here that this sum is only a less inadequate consideration for the lands ceded.
 
 
 9
 According to the commissioners who made the Treaty of 1816, their reason for reserving the area "five leagues square" was that it "contained those immensely valuable lead mines which for some time past had attracted and occupied much public attention * * *." The "stipulation would authorize the President to make such reservation as would include all those mines * * *."
 
 
 10
 The lead deposits were in Area 147 and were actually little exploited up to 1825, at which time there were but 30 miners at work and few locations considered worth "giving bond for the occupation thereof." The area, however, continued to be deemed rich in lead and had attracted at least 10,000 people for mining, and presumably supporting trades, by the time of the Treaty of 1829. The deposits were known to extend along the east side of the Mississippi, from near to its confluence with the Wisconsin, south 100 miles, plus or minus a few, to the Apple River, and east for from 20 to 30 miles. In 1828 the production of the mines was 12,311,730 pounds of lead.
 
 
 11
 Exploration started in the neighborhood of Galena and on the Fever River, near the south end of the deposits as they are now known, but by 1828 miners were operating up country near the Wisconsin River. The whole area was recognized as one where "the same geological features present themselves * * *." Beyond all actual exploration as of 1829, there would seem ample evidence to show the existence of a much larger region, including perhaps the whole northern half of Area 147, where the probabilities of extracting minerals in commercial quantities were deemed sufficient in 1829 to justify expenditures for exploration and development, immediately or at a somewhat later date. Thus, the price a willing buyer and a willing seller would have settled on for fee title to land in that area would have been influenced, to some degree, be it great or small, by such factor. The value of actually non-mineral land was also affected; the miners used their gains from mining to buy farm land, food had to be grown for the miners, transportation was necessary and therefore roads had to be built.
 
 
 12
 In 1821 the superintendence of the lead mines allegedly reserved to the United States by the 1816 Treaty was transferred to the War Department, the lead being regarded as a strategic material. It would seem that at first there was some uncertainty whether a contiguous area "five leagues square" should be laid out under authority of the 1816 Treaty in that part of Area 147 deemed to be richest in lead, with the hope it would contain enough good mines to satisfy all of the prospectors, or whether the prospectors should first go anywhere in Area 147, stake out locations, and apply for leases thereon, which would be pro tanto part of the reserved area, however scattered. The latter procedure won out because the former would have had the unacceptable consequence of necessarily leaving some of the lead deposits in Indian ownership, as the lessons of actual exploration speedily bore out. The adopted routine was for a prospector to stake out an area and apply for a lease; it would normally run for three years. The area covered by a lease was at first 160 acres, later 320 (there also were ten acre mining permits). The rent was one-tenth of the lead recovered, in kind. Many prospectors, however, omitted the formality of applying for leases and paying rent and had little regard for the legal rights of the United States or the Indians. The result was that the whole area, many times five leagues square, was being cut up and made useless for the Indian way of life. The army ordnance officers in charge naturally cared more for a maximum accumulation of munitions than they did for the Indians' well-being. They did not want the miners to be "cramped," as any contiguous reservation necessarily would do. They represented to Washington that the Indians never used the area and did not care what was done with it, but the Indians themselves, when finally consulted, hardly supported this view. Responsible persons pointed out that this was an impossible situation, sure to lead to a clash, and a purchase of the whole area from the Indians was seen as the only way out.
 
 
 13
 The Commission determined in finding 75 that, of the "five leagues square," about 40,000 acres had been selected as of 1829,[3] through leases and mining permits and by the setting aside of 640 acres for the townsite of Galena, leaving about 100,000 acres unselected. It also found that the total probable area of [unselected] lead deposits did not exceed 18,000 acres.[4] Therefore, the possibility that a "prospective purchaser" from the Indians could share in the lead discoveries was too remote to be considered. This was based, of course, on the premise first adopted by the Commission, that the United States retained in 1816 the legal right to select parcels of any size, at any location within Area 147, as it had been doing since 1822, regardless of how the Indians' estate was cut up thereby, and apparently also regardless of how long it took for exploration of Area 147 to be complete. Until that unknown future date the Indians were to wait and never know what part of Area 147 belonged to them.
 
 
 14
 The United Nation denies that such an interpretation of the treaty is a proper one, and we agree. The statement of the United States' position is, indeed, its own most effective refutation. It takes a wrong done to a treaty partner and makes it the basis of a finding of right, though never acquiesced in, and though but for the 1829 purchase, it would have, if persisted in, led to a collision between the parties.
 
 
 15
 The Indian Claims Commission held that "The said United Nation did not receive any interest in the reservation of five leagues square" as set forth in Article 2 of the Treaty of 1816, quoted supra, and found that under this reservation the United States had "retained lead reserves of not to exceed 144,000 acres." In our opinion, we need not decide the question whether there is substantial evidence to support the finding of the Commission that it was intended at the time of the Treaty of 1816 that lands bearing lead would be selected as tracts reserved from the cession to the United Nation, since we hold that as a matter of law the Indian Claims Commission erred in interpreting Article 2, and that the reservation in question was not meant to include all lands bearing lead without any regard to the other purposes which led to the signing of the treaty. We are free to reach our own independent conclusion on this question since the interpretation of a treaty is a question of law and not a matter of fact. See, e. g., Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 908, 161 Ct. Cl. 258, 262 (1963); Lower Sioux Indian in Minnesota v. United States, 163 Ct.Cl. 329, 332 (1963).
 
 
 16
 When the United States enters into treaties with an Indian tribe, said treaties "are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them." United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 797, 82 L.Ed. 1213 (1938). "[T]hey are to be construed, so far as possible, in the sense in which the Indians understood them, and `in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.' Tulee v. State of Washington, 315 U.S. 681, 684-685, 62 S.Ct. 862, 86 L.Ed. 1115." Choctaw Nation v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). And, where the words of a treaty are not clear or unambiguous, we should review both the history and purpose of the Article in question in an effort to determine its true meaning. Lower Sioux Indian in Minnesota, supra, 163 Ct.Cl. at 332. To help us in this search, appropriate landmarks are, inter alia, the instructions to the treaty commissioners, their report to their superior, the treaty preamble, the President's message transmitting the treaty to Congress and the subsequent treatment given to the terms of the treaty by the United States and the Indians. Cf. Lower Sioux Indian in Minnesota, supra, 163 Ct.Cl. at 334; Minnesota Chippewa Tribe, supra, 161 Ct.Cl. at 262, 315 F.2d at 909.
 
 
 17
 In 1816 the validity of the Illinois cession to the United States, made under the treaty of 1804, was contested by some of the Indian tribes who used the land contained therein as a hunting ground. Treaty commissioners were sent to this area and were instructed by Secretary of War Crawford to quiet those claims by offering to the Indians "such parts [of the Illinois cession] as lie North of the Northern line of the state of Ohio extended westward, to the Mississippi river, and east of the Western boundary of the Indiana territory." In making this tender, the commissioners had to make a reservation for a military post at the mouth of the Wisconsin River, which was to include both banks of the river, "and such other reservations for the same object" as their knowledge of the territory would show them to be necessary. The United States at this time did not want the entire Illinois cession inhabited by whites because this would have necessitated the formation of another territorial government and would have given rise to a small settlement in the Indian territory separated by an immense distance from the inhabited part of the territory. It was decided, as Secretary of War Crawford's instructions bear out, that since the claims of the Indians were for a tract of land smaller in size than the whole Illinois cession, the easiest way to avoid the problems that were foreseen was to give the Indians their own land to live on, leaving the remainder to the United States, with a reservation for additional military posts. The preamble to the treaty also showed that its object was to settle rights to land ceded to the United States by the Sac and Fox in 1804 and the President told Congress that the treaty was one of "peace, friendship and limits." (Emphasis supplied.)
 
 
 18
 In their report to Secretary of War Crawford, the treaty commissioners noted that within the boundary they were directed to recede lay immensely valuable lead mines. "[A]nd not being certain that it was contemplated or intended by [their] instructions, [they] thought it advisable to endeavor to introduce into the Treaty a stipulation which would authorize the President to make such reservations as would include all those mines," and they thought they had succeeded in so doing. There is no question whether they had the power to do this as their action was ratified by Congress. However, we do find that such an attempt clearly was not one of the purposes for which the treaty was to be entered into nor did the language employed carry out their intention. It is true that it was the declared policy of Congress, as enunciated by section 5 of the Act of March 3, 1807 (2 Stat. 448, 449), to reserve the lead lands of the Indiana territory, which included Royce Area 147, from public sale and that the President had been delegated control of the disposition of mineral lands. While this may have been Congressional policy, the reasons for making the treaty were not directed to it nor did the language used carry it out. (Emphasis supplied.)
 
 
 19
 Not only do we deem that the United States is now trying to rewrite the Article in question, we also view their dealings with the Indians as less than fair and honorable. This is borne out by the commissioners' observation that, "Taking all things into consideration we do not think the amount of goods which we have contracted to give them, a sufficient equivalent for the relinquishment and cession which we have obtained from them * * *."
 
 
 20
 In 1817, in a letter to General Land Office Commissioner Meigs, two of his subordinates stated, "They [people seeking lead mine leases in the Illinois cession] are sensible of the danger they might incur by trespassing on the rich mineral grounds which have been receded to the Indians by the late Treaty [that of August 24, 1816], since it is known that the Indians in that Country would not suffer even an attempt to work their mines with impunity * * *." Five years later, Lt. Col. Bomford, then on ordnance duty, stated that "the locations of each [the lead mine leases to settlers] must be made in one body, not indifferent parts or places * * *."
 
 
 21
 It is true that in 1829 Lt. Col. Bomford, then Supervisor of the Lead Mines of the Upper Mississippi Valley, stated that the object of the 144,000 acre reservation was to enable the Government to determine which tracts of land within Royce Area 147 it would be most advantageous for it to have and that each selection was "left without instruction as to time or situation within those limits, and [might] be taken, either in one body, or in as many detachments or parcels, as [was] thought proper." However, we fail to see how the defendant can say that Lt. Col. Bomford's later statement goes to show what was intended by the reservation when he had been of the contrary view only seven years before, a date closer in time to the signing of the treaty we are now construing.
 
 
 22
 In 1827, Lt. Martin Thomas, at that time Agent of the President for the selection of the United States lead reserves and Superintendent of the Upper Mississippi Valley Lead Mines, was of the opinion that the United States had retained 144,000 acres of lead land within Royce Area 147 and that the location of the reservations in detached parcels was at the discretion of the Government. He stated, "The reservations being for mining purposes, they are necessarily made in detached parcels. This presents a difficulty as respects the jurisdiction of Illinois or Michigan. The intermediate land between the reservations is still the property of the Indians; a purchase of which would seem to be the only way of removing the embarrassments produced by this state of things." We think the "embarrassments" Lt. Thomas referred to were two: first, the fact that his interpretation and the actual implementation thereof would fly in the face of the treaty instructions in that if the Government did not buy the "intermediate land" a new territorial government, in all probability, would have had to have been set up to govern the lead lease areas, and second, the fact that under this interpretation the Indians would have had no piece of contiguous land on which they could permanently settle because the Government would have had the right to come in at any time and designate all or a part of the sections the Indians had chosen as being part of the tracts reserved to the United States under the reservation in question. We think Lewis Cass, then Governor of the Michigan territory, and Thomas L. McKenney, head of the Office of Indian Affairs, in their letter to Secretary of War Barbour in 1827, correctly expressed the interpretation to be given to the 144,000 acre reservation: "[C]ertainly, nothing can be more incorrect than a construction which gives the right of location in tracts of one or two hundred acres over the whole country * * * and considering the reservation of fifteen miles square complete, when the quantity located equals that extent. It would render the whole country utterly useless to the Indians, and the exercise of separate jurisdiction over these people and ours would be impracticable. All the provisions of the laws, regulating trade with them, would be inefficient; and, in fact, the principles of our Indian policy must be wholly abandoned, if this construction [that subscribed to by Lt. Thomas] prevails."[5] (Emphasis supplied.)
 
 
 23
 Certainly, where administrative practice has been consistent and generally unchallenged, such "practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion [and] making the parts work efficiently and smoothly * * *." Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). And, where such practice is disputed in later years, more weight should be given to the interpretation made closer in time to the making of the law to be construed.
 
 
 24
 In later treaties and/or treaty negotiations, the United States clearly recognized the fact that the United Nation continued to claim the lead lands within Royce Area 147. It could even be said that the United States implied that the United Nation did own the lead areas. In August, 1828, at treaty negotiations with the United Nation, Winnebago and Sac and Fox, Commissioner Pierre Menard stated to the United Nation's representative, "There is no game on your land, it is good for nothing except the lead." In his instructions to the 1829 treaty commissioners, the Secretary of War stated that they were to treat "* * for a relinquishment of the title of those Indians to the mineral regions claimed by them * * *." At those treaty negotiations the commissioners stated, "Brothers and Friends — Your Great Father has also sent us to pay you what he promised you last year [in the Treaty of 1828 (7 Stat. 315)] for the occupation of your mineral country occupied by his White children * * *." And, in a letter sent by the commissioners to the Secretary of War, they stated that the United Nation had ceded "* * * to the United States, all the country claimed by them (embracing their mineral lands) * * *." (Emphasis supplied.)
 
 
 25
 Suppose, however, that the negotiators of the 1816 treaty on the United States side did intend the reserved right of selection to be exercised by the location of mines and the grant of leases thereon, wherever and whenever that occurred, in random fashion. This intent would not bind the Indians if they did not know of it and the language of the treaty did not fairly express it. Cf. a recent case in the Customs Court, First Division, The De Haan Company v. United States, 57 Cust.Ct. , C.D. 2722 (June 28, 1966, appeal pending), in which it was held that Mexico was not bound by a definition of "huarache" published by the Tariff Commission in 1943, not shown to have been communicated to the Mexican negotiators when a duty reduction on huaraches was negotiated in 1942.
 
 
 26
 A fair interpretation of the treaty is that the President would select the 144,000 acres in his capacity as "Great White Father" of the Indians as well as head of the United States government. A callous disregard of the interests of either would be an abuse of discretion. Accordingly, the valid contemporaneous expectation was that he would select a large, contiguous tract (or tracts), without awaiting full mineral exploration, which would leave the Indians to carry on their life, undisturbed in their traditional manner, in the parts not selected, assured of ownership, and free from collisions with the Whites. For the Whites too, there would be advantages in not being scattered about among Indian neighbors. The view that prevailed later on that selection might be accomplished pro tanto by mineral locations, permits, and leases of from ten to 320 acres, seems to have reflected pecuniary interests which then, as now, sometimes might unduly influence legal interpretations. So far as this view was acted on by officials of the United States government, it was an abuse of the discretion reserved in the treaty. As the Indians rightly believed, their rights were being violated; it was also a collision course, the impact being averted only by the timely purchase of the entire area from the Indians in 1829.
 
 
 27
 This is not to say, of course, that in selecting the boundaries of a large, contiguous tract (or tracts), not exceeding 144,000 acres, the President might not have been influenced by the location of known mineral deposits and if the whole of them could have been included within such tract (or tracts) he might have done it. However, the record reflects that in no way could a large, contiguous tract (or tracts) have been located without failing to include at least some of the known deposits, not to mention those then unknown, in Area 147.
 
 
 28
 In addition to the contention regarding the type of acreage the United States could reserve, the United Nation contends that defendant's right to the 144,000 acres was contingent, not absolute, and that it was abandoned in fact, and lost as a matter of equity, in 1829, because of the defendant's failure to exercise its rights thereunder beyond its reservation of a town-site for Galena. The Indian Claims Commission found that there was no intent to vest title in the Indians as to any of the 144,000 acres retained by the defendant and that while the defendant did not exercise its right of reservation as to the complete 144,000 acres, this right was not lost by the failure to make further specific reservations. With these findings this court agrees, at least to the extent the right was not lost as early as 1829. "In order * * * to ascertain what is granted, we must first ascertain what is included in the exception; for whatever is within the exception, is excluded from the grant * * *." Greenleaf's Lessee v. Birth, 6 Pet. (31 U.S.) 302, 310, 8 L.Ed. 406 (1832). We hold that while the defendant did not have the right to choose scattered lands up to the 144,000 acre maximum, it did except an undesignated total of 144,000 acres from its grant to the United Nation. As of 1816 title to Royce Area 147 was in the defendant and it was within its rights in excepting from its cession to the United Nation 144,000 acres of its own land.
 
 
 29
 In 1829 the United Nation ceded Royce Areas 147 and 148 back to the United States (7 Stat. 320). Article 3 of the Treaty of 1829, supra, at 321, reserved 7,040 acres for the use of named chiefs and their bands and Article 4, supra, at 321, contained grants by the United States to named individuals of a total of 9,600 acres. The Indian Claims Commission considered the total 16,640 acres as land not ceded by the United Nation, and therefore not to be compensated for. The United Nation contends that the Commission erred with respect to the 9,600 acres specified in Article 4. We think the Commission was correct.
 
 
 30
 The United Nation argued that the lands referred to in Article 4 were ceded by it to the United States and in turn conveyed by the United States to the named grantees. It also argued that these grants represented bribes given by the United States to the named individuals to get them to influence the Indians to sign the treaty.
 
 
 31
 The Indian Claims Commission could find no proof of fraud or undue influence with respect to the grants and we agree. While there was some indirect evidence of allegedly fraudulent dealings by the United States in prior treaties, such evidence cannot be used to establish fraud by implication in the 1829 Treaty. No protest was made by the United Nation against the provision for these grants and "[s]uch lack of protest has been considered clear indication that no fraud has been practiced." Sac and Fox Tribe, et al. v. United States, 159 Ct.Cl. 247, 253 (1962). And, it is too late in the day to conjure up a fraud now.
 
 
 32
 It is true that the 9,600 acres were "granted" by the United States to named individuals and not "reserved" for them, as were the 7,040 acres specified in Article 3. The defendant argued that since the terms "reserved" or "reservation" are used to set aside, out of lands ceded, an area which the Indians are to continue to use and occupy in a communal manner, the use of the term "grant" with reference to the individuals, as opposed to the term "reserved" used with reference to the chiefs and their tribes, was to signify that they were being given something which neither they or any other tribal member had had before, i. e., an individual right or interest in land separate and apart from the tribe.
 
 
 33
 While we recognize the distinction made by the defendant, we must note that the interests which the individuals received were not as broad as complete and unrestricted ownership. Article 4 specified that the individual grantees could never lease or convey their land without the permission of the President of the United States. However, we think this factor strengthens the defendant's argument, especially in light of the fact that some of the individually granted lands were located near to, or adjacent with, the tracts reserved for the chiefs and their tribes. The United Nation has recognized the correctness of excepting the tracts "reserved" from the land for which they are to be compensated. The same recognition should be given to the individual "grants" located within the "reserved" Indian community. As to the "grants" not located within the community, it has been the practice of the Indian Claims Commission not to include in the area for which compensation is to be allowed, lands which, though ceded to the United States under one provision of a treaty, were by subsequent treaty provisions to be granted by the United States to third parties. Citizen Band of Potawatomie Indians v. United States, 6 Ind.Cl.Comm. 414, 426 (1958), 14 Ind.Cl.Comm. 518, 566 (1964); Red Lake, Pembina and White Earth Bands v. United States, 6 Ind.Cl.Comm. 247, 334-335 (1958), aff'd 164 Ct.Cl. 389 (1964). With this practice we concur.
 
 
 34
 The next issue for decision is the standard by which to measure the amount of the United Nation's award. This court has held that the measure of recovery in cases asserting claims based on cessions for unconscionable consideration "* * * is the difference between the true market value of the land ceded at the time of the cession and the consideration paid for such land by the Government, less offsets for gratuities and less any payments the United States may have made `on the claim'." Miami Tribe of Oklahoma v. United States, 175 F. Supp. 926, 954, 146 Ct.Cl. 421, 470 (1959). And, as stated in the Osage Nation of Indians v. United States, 3 Ind. Cl.Comm. 231, 236 (1954), "Market price is the highest price estimated in terms of money which land will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all the uses and purposes to which it is best adapted and for which it is capable of being used." To the extent not withheld from them by the 1816 reservation, the Indians are entitled to have considered in fixing their award the enhancement in the value of Area 147 caused by the minerals it contained. United States v. Shoshone Tribe, supra. In determining "fair market value," what is called for is a valuation of the properties as a whole and not the mere sum of the values of quantities of various individual components such as mineral deposits, or stands of timber, or the value of the bare land. The Yakima Tribe v. United States, 158 Ct.Cl. 672, 696 (1962); United States v. Certain Lands, 45 F.Supp. 126 (S.D.N.Y. 1942). We note, however, that while "fair market value" is the applicable standard of measurement, it may be more or less than the Government's statutory minimum price for land. Miami Tribe of Oklahoma, supra, 146 Ct.Cl. at 451. (Emphasis supplied.)
 
 
 35
 We have found that the Commission erred in interpreting Article 2 of the Treaty of 1816, supra. In light of its interpretation, the Commission erroneously failed to consider evidence showing how the lead deposits would influence, at least to some extent, the total fair market value.[6] We should not try to establish the correct fair market value but should remand the case to the Commission to perform that function.
 
 
 36
 "In the federal system it has been the usual rule that, where the reviewing court exposes the legal error in the decision of an administrative agency, it should not decide for itself those remaining issues within the agency's special competence, unless there could be only one answer; if the agency would have room to choose, the court should remit the case to allow that discretion to be exercised." The Spokane Tribe of Indians v. United States, 163 Ct.Cl. 58, 70 (1963), and see cases collected therein.
 
 
 37
 "This court has followed that standard on factual or discretionary questions brought here from the Indian Claims Commission." The Spokane Tribe of Indians v. United States, supra, 163 Ct.Cl. at 70, and see cases collected therein. "Congress has designated the Commission to `hear and determine' the claims (25 U.S.C. section 70a); this court's function is that of review (25 U.S.C. section 70s)." The Spokane Tribe of Indians v. United States, supra, 163 Ct. Cl. at 71, and cases collected therein at footnote 12.
 
 
 38
 In this case a remand is clearly in order. We think it incumbent upon the Commission to answer the following questions: (1) what is the fair market value of Royce Area 148? (2) what is the fair market value of Royce Area 147, including, not just the value of the land without mineral deposits, but also whatever enhancement "known"[7] minerals might add?[8] and (3) what, then, is the total fair market value of Royce Areas 147 and 148? The Commission must note that since the $0.70 per acre value figure it determined was supported by substantial evidence, as far as the collection of such evidence went, said figure is the minimum valuation it can now find. See Nez Perce Tribe of Indians v. United States, 176 Ct.Cl. 815 (1966). We agree, however, with the Commission's determination that from the award granted to the United Nation is to be subtracted $375,691.28, representing allowable gratuitous offsets and the consideration paid by the United States in 1829. In redetermining the value of Area 147, the Commission must also note that the existing record contains substantial evidence showing the value of the "known" but unselected lead deposits as of 1829 to be more than negligible. Of course, it is the Commission's function to determine exactly what that value was and we do not pretend to make a determination of that issue.
 
 
 39
 We have also found that the Commission was correct in finding that the reservation of a maximum of 144,000 acres out of the area ceded to the United Nation in 1816 did not have to be exercised in order to be valid, but, the Commission erred in finding that the President could pick and choose mineral lands, whenever and wherever located, so as to have such acreage include all the lead lands within Area 147, up to the specified maximum. Accordingly, the Commission should find what number of acres within Area 147 had actually been selected by the United States as of July 29, 1829 (through the town-site reservation and the granting of mining leases and permits) and should subtract the fair market value thereof from the fair market value of Area 147 as a whole. The fair market value of this remainder of Area 147 is to be allocated to the United Nation's successors in the ratio that the acreage ceded to the United States bears to the total acreage of Area 147 less that acreage actually selected by the United States. The "acreage ceded to the United States" is the total acreage of Area 147 less the 144,000 acre reservation and that part, if any, of the 16,640 acres reserved and granted under Articles 3 and 4 of the Treaty of 1829 situated within Area 147. The United Nation's successors are also to receive the value of Area 148, less that part, if any, of the 16,640 acres situated therein.
 
 
 40
 We may suppose that the United States might have done better for itself than this if it had made a timely selection of its 144,000 acres, including mineral lands, in a proper manner, but to reconstruct such a hypothetical selection now would involve guesswork and be purely speculative. The United States must bear the consequences of the improper and dilatory way it went about the selection. Our method, however, does allow it the benefit of its actual selections, even though not properly made. The intervention of the "Eastern Potawatomie" and their claim to share in this award represent issues which are severable from the liability of the United States herein. We have severed them, and suspend judgment thereon pending our decision in Appeal No. 5-65. With respect to the liability of the United States, the findings and order of the Indian Claims Commission are affirmed in part and reversed in part, as indicated in this opinion, and the case is remanded to the Commission for further proceedings consistent with this opinion.
 
 
 41
 Affirmed in part, reversed in part, and remanded. NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 Notes:
 
 
 [1]
 The issue, who may share in the award, is severed and is the subject of Appeal No. 5-65
 
 
 [2]
 See appendix for map
 
 
 [3]
 Cf., however, the Government's brief, p. 16-#17, which alleges that only about 20,000 acres were selected out of a total lead deposit acreage of 40 to 50,000 acres. We need not resolve this now, as it is one of the matters for the Commission's redetermination on remand
 
 
 [4]
 Ibid
 
 
 [5]
 Lewis Cass was a lawyer and a diplomat, later to become Ambassador to France, Secretary of War, Secretary of State, a United States Senator, and a presidential candidate. 4 Encyclopedia Brittanica (1957 Ed.) 970, Article: "Cass, Lewis." He himself had negotiated treaties with Indian tribes and he was the author of a book about the Indians. His view, as quoted, was more than a statement of what the President ought to do under the treaty; it was an opinion he was well-qualified to give, as to what the treaty meant. Our holding that the construction of the treaty, a legal question, is the controlling issue herein, of course makes this contemporary interpretation by a lawyer of special importance. Yet, the Commission preferred to rely on the views of subordinate Army officers having an obvious bias in this matter
 
 
 [6]
 Although Area 148 contains no lead deposits and although the title of the United Nation to Area 148-A has a different origin, there should be no difference in the legal standards used in valuing Area 147 and all of Area 148. Minnesota Chippewa Tribe, et al. v. United States, 161 Ct.Cl. 258, 269, 315 F.2d 906 (1963)
 
 
 [7]
 By "known" we do not mean only those deposits that had actually been discovered as of July 29, 1829, nor are we requiring that there must have been firm proof at that time that lead was present within a given tract. The test as to whether mineral deposits are "known" to exist is an objective one, "* * * based on the known and observable conditions as they should be evaluated by practical, prudent, informed businessmen." Estate of Charles O. Fairbank v. United States, 164 Ct.Cl. 1, 13 (1964). "[T]he over-riding standard is the reasonableness of a belief that the land contains [lead] which can be developed commercially." Ibid
 
 
 [8]
 For example, the probability that roads would be built to pass through mining areas would cause an increase in the value of the land containing lead and its neighboring tracts beyond the increase occasioned by the lead itself; even if the Government could choose its tracts under the reservation at random, the value of the Indian lands neighboring those tracts would also increase even if they did not contain lead deposits. Parenthetically, we may observe that for this reason the exclusion of all mineral enhancement from the award would have been improper even if the Government's random selection method had been authorized by the treaty