The **CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA**

v.

The **UNITED STATES.**

No. 50233.

United States Court of Claims.
Jan. 22, 1971.
As Amended April 23, 1971.

Richard A. Baenen, Washington, D. C., for plaintiff; Glen A. Wilkinson, Washington, D. C., attorney of record. Charles H. Gibbs, Charleston, S. C., and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

John D. Sulivan, Washington, 'D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This is still another phase of the many-sided suit brought by the Confederated Salish and Kootenai Tribes under the special jurisdictional Act of July 30, 1946, 60 Stat. 715. This particular claim, under paragraph 10 of the petition, has resulted in an opinion and findings by Trial Commissioner Harry E. Wood in which he recommends that the plaintiffs be held entitled to recover 6,066,668.78 plus interest from January 1, 1912. The facts and background, and the reasons for the commissioner's ultimate recommendation, are set forth in his opinion and findings which are annexed hereto. The Government has excepted to most of the conclusions in the opinion. The plaintiff has excepted only to the commissioner's choice of the interest rate from 1960 forward. The case has been submitted to the court on oral argument and briefs.

The court agrees with the trial commissioner's recommended conclusion of law and with his findings of fact which are adopted. The court also agrees with, and adopts, his opinion, except for Part IV(d) thereof (entitled "The Lands Patented to Settlers").

■ With regard to the lands discussed in that portion of the commissioner's opinion, we are of the view that the defendant did take those lands by eminent domain, but that that conclusion is sufficiently grounded on the fact that Congress provided, in authorizing the disposition of the tribal lands to homesteaders, that the proceeds could be used for the benefit of non-Indians, *i. e.* through the irrigation project which was beneficial to white settlers as well as Indians. See Findings 12(b) and 12 (c). We agree with the trial commissioner that such diversion to others of the proceeds of the Indians' land was inconsistent with a good faith effort to give the Indians the full money value of their land, and that under the principles of Three Affiliated Tribes of Fort Berthold Reservation v. United States, 390 F.2d 686, 182 Ct.Cl. 543 (1968), an eminent domain taking necessarily resulted.[1] In this respect, the present case differs materially from Klamath and Moadoc Tribes v. United States, Ct.Cl., and Anderson v. United States, Ct.Cl., 436 F.2d 1008, in which we are today deciding that constitutional takings did not follow from the disposition of those tribal lands to third parties because the United States made a good

---

[1] That Congress, much later, paid back the Indians for the amount so diverted does not alter this conclusion. Three Affiliated Tribes of Fort Berthold Reservation v. United States, 390 F.2d at 698, 182 Ct.Cl. at 564.

faith effort to obtain full value for those Indians.

This single ground (diversion of substantial proceeds for the benefit of non-Indians) being enough to sustain the holding of a taking in the present case, we have no occasion either to agree or to disagree with the other reasons the trial commissioner gives (in addition) for reaching that conclusion on the lands disposed of to settlers, and therefore neither adopt nor reject that portion of his opinion.

■ Plaintiffs' exception with respect to the computation of interest is rejected. Their argument is that the rate of interest used as a measure of just compensation should be revised to the level of 6% for the period from January 1, 1960 until payment (the commissioner used 4% from January 1, 1934, 5% before that date). In support of this position, plaintiffs set forth in their brief to the court various statistics and charts, of which it is said we can take judicial notice, as well as legal arguments. Though the claim for 6% interest from 1960 was made to the commissioner, he was not presented with these statistical materials now offered to the judges, nor was any testimony or other comparable evidence proffered to sustain the claim. We think that an issue of this character should have been threshed out at the trial, where both sides could have introduced evidence (and possibly expert testimony, subject to cross-examination) and an adequate record made for the court's guidance—and not, as here, left largely to the present stage of review by the court via an insufficient presentation through briefs and oral argument. In these circumstances, we decline to consider in this case the contention that the interest rate should be 6% from January 1, 1960, and therefore adopt the commissioner's use of the traditional 4% for that time-span.

For these reasons, and on these grounds, the court concludes that plaintiffs are entitled to recover $6,066,668.78, plus interest thereon at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934, and at the rate of 4 percent per annum thereafter until paid.

## OPINION OF COMMISSIONER

(Re: Paragraph 10 of the Petition)

WOOD, Commissioner:

In this claim, one of several brought under a special jurisdictional act,[1] plaintiffs allege that by the Act of April 23, 1904, 33 Stat. 302, defendant "opened" the Flathead Indian Reservation in breach of the Treaty of Hell Gate, July 16, 1855, 12 Stat. 975,[2] and without plaintiffs' consent. Plaintiffs further allege that they thereby "became entitled to just compensation under the Fifth Amendment * * * for the lands disposed of pursuant to the statute."

### I

By the Treaty of Hell Gate plaintiffs ceded to defendant a vast area of land, theretofore held under aboriginal title, located within what are now the States of Montana and Idaho. Article II of the Treaty reserved from the cession a tract of some 1,245,000 acres in northwestern Montana for the "exclusive use and benefit [of plaintiffs] as an Indian reservation." The reserved tract became known as the Flathead Indian Reservation.

In 1896, pursuant to Congressional authorization, a commission was appointed to negotiate with plaintiffs (and other Tribes) for the cession of portions of their respective Reservations. The work of the commission was continued from year to year until June 30, 1901, and during this period efforts were made to secure agreements with plain-

---

1. Act of July 30, 1946, 60 Stat. 715, quoted in part in Finding 1(a).

2. The Treaty of Hell Gate was ratified March 8, 1859, and proclaimed April 18, 1859; it is set out in part in Findings 2(a)-(c).

tiffs for the cession of portions of the Flathead Indian Reservation. The efforts failed.

Shortly thereafter, the Act of April 23, 1904, *supra*, providing for "the survey and allotment of lands now embraced within * * * the Flathead Indian Reservation * * * and the sale and disposal of all surplus lands after allotment",[3] was passed. Pursuant to the 1904 Act, and related legislation,[4] defendant opened the Reservation to settlement and entry; "hereby granted" two Sections of each Township to the State of Montana for school purposes; granted certain lands to eleemosynary institutions; and reserved lands for a National Bison Range and other federal purposes.

Pursuant to the 1904 Act, some 404,-047.33 acres of plaintiffs' land were patented to settlers; some 60,843.04 acres of such land were granted to the State of Montana for school purposes; some 18,523.85 acres of such land were reserved by defendant for the National Bison Range; and some 1,757.09 acres of such land were reserved by defendant without appraisal for other purposes (churches and schools, subagency reserve, railroad selections, and state selection, the latter apparently for biological station purposes); the total acreage so disposed of, in 4,834 parcels, was 485,-171.31 acres.[5]

The 4,834 parcels here in suit (Finding 21) were "entered" as early as 1903 and at least as late as 1932. By stipulation filed with the court on September 30, 1966, however, the parties agreed that: "For purposes of determining the fair market value of all of the lands made the subject of plaintiff's claim in Paragraph 10 * * * the critical date of valuation shall be January 1, 1912." This stipulation, entered into "so that the subject lands may be appraised and valued as of a single date, * * * shall serve to determine and fix the critical date of valuation of all lands sued upon in this case * * *." *Cf.* United States v. Southern Ute Tribe or Band of Indians, 423 F.2d 346, 361, 191 Ct.Cl. 1, 28, cert. granted, 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970).[**]

At trial held July 15, 16, 17, and 18, 1968, in Washington, D.C., both plaintiffs and defendant presented extensive expert testimony as to the fair market value of the "subject lands"[6] on January 1, 1912. Plaintiffs' appraiser analyzed sales of land within the Reservation itself during the period 1910–1916. Defendant's appraiser studied sales of land on and surrounding the Reservation during the period 1906–1916; he subsequently concluded, however, that 1909–1916 Reservation sales data, "tempered to reflect my opinion of value", afforded

3. According to Senate Report No. 1930, 58th Congress, 2d Session (1904), the Treaty of Hell Gate expressly provided for allotment of "the necessary lands * * * to the Indians, and [the sale of] all the surplus lands * * * for their benefit. The present bill merely provides the necessary means for carrying the agreement with the Indians into effect." *Cf.* Section II, *infra*.

4. The Act of April 23, 1904, *supra*, and related statutes, are treated in Findings 5–15. These enactments are, where appropriate, referred to hereinafter as "the 1904 Act".

5. Through June 30, 1951, plaintiffs had received for such lands a total of $1,343,331.22. Finding 22 contains a breakdown of amounts attributable to various sorts of dispositions (*i. e.*, lands

patented to settlers, school (and other) lands, and the National Bison Range).

** The Supreme Court has granted certiorari on the defendant's petition to review this court's decision in the *Southern Ute Indians* case, but the issues presented by the Government for review by the Supreme Court do not involve the propositions for which the case is cited in the present opinion. [footnote by the court]

6. The "subject lands" totaled 488,093.81 acres, in 4,838 parcels; these figures were derived from the Lee-Kenney Report (Finding 21). Four less parcels, and slightly less acreage, are in fact involved, but the discrepancies (understandable in litigation of the complexity of this) have no real effect on the valuation problem herein. See Findings 21, 23.

the truest and most reliable evidence of value.

At the conclusion of the July 1968 trial, the parties narrowed the valuation problem by stipulating, in open court, that "the total value of the subject tracts on January 1, 1912 if no adjustment for improvements was made to the market data relied on [hereinafter "the stipulated value"] would be $8,910,000." [7] Since, however, the "market data relied on" by both appraisers did include at least some element of value due to "improvements", the parties agree that in order to arrive at the fair market value of plaintiffs' lands, unimproved, on January 1, 1912 (hereinafter "fair market value"), a downward adjustment of the stipulated value is necessary.

Following the July 1968 trial, the case was briefed in two stages: first, requested findings of fact and briefs on the issue of value were filed. Thereafter, the parties were requested to, and did, file supplemental requested findings of fact and briefs on the issue whether or not there was a Fifth Amendment taking of any or all of plaintiffs' lands disposed of pursuant to the 1904 Acts.[8] There has also been helpful oral argument on the issue of taking, at the request of the commissioner.

Plaintiffs contend that all of their lands disposed of pursuant to the 1904 Act were taken, within the meaning of the Fifth Amendment, and that they are therefore entitled to just compensation as traditionally measured. They propose to convert the stipulated value ($8,910,000) into fair market value by a downward adjustment of 10 percent ($891,000). Plaintiffs thus seek to recover the net difference between these two sums ($8,019,000), less the $1,343,-331.22 credited or paid to them as a result of the loss of their lands,[9] or $6,675,-668.78 plus interest thereon, not as interest but as a part of just compensation, from the "date of taking." [10]

Defendant, denying any taking, argues that the stipulated value exceeds fair market value by much more than 10 percent. Its proposed downward adjustment for "improvements" is slightly more than $3,000,000, and its proposed fair market value is $5,844,410.[11] Thus, defendant asserts, plaintiffs are entitled to recover only $4,501,078.78 ($5,844,-410 less the $1,343,331.22 previously "paid" to plaintiffs), "without interest." [12]

The principal issues are, therefore, the appropriate reduction of the stipulated value of plaintiffs' lands disposed of pursuant to the 1904 Act to convert that "value" into the fair market value of such lands; and, whether such lands were taken, in whole or in part, within the meaning of the Fifth Amendment.

## II

One preliminary argument requires consideration. While defendant urges that the issue of consent is immaterial,[13] it contends, and plaintiffs deny,

---

7. See note 6, *supra*.

8. Defendant also filed objections to plaintiffs' supplemental requested findings of fact.

9. There is no formal stipulation concerning the treatment to be accorded this sum, but there is implicit agreement that it should simply be deducted from fair market value. This practical approach to what might otherwise be an insoluble problem seems unobjectionable, and it is adopted.

10. See Section V, *infra*, for plaintiffs' contentions as to the "date of taking."

11. In the opinion of defendant's appraiser, plaintiffs' "subject lands" had a fair market value of $5,900,000. Defendant's position that this figure should be further reduced in consequence of the "reduced acreage" now in suit is unfounded. See Findings 21, 23.

12. Defendant's Brief on Valuation, pp. 11, 27.

13. Defendant's position in this respect seems strange. At least at first blush, it would seem that agreement by plaintiffs to the disposition of their lands by defendant might point this phase of the litigation in a markedly different direction than it now occupies. Resolution of the problem of materiality is, however, unnecessary, in light of the unsoundness of defendant's argument of consent.

that by Article VI of the Treaty of Hell Gate, *supra,* plaintiffs consented to the opening of the Flathead Reservation and the disposition of unallotted tribal lands.

Article VI (Finding 2(c)) provided in substance that the President might cause part or all of the Reservation to be surveyed into lots, and to assign "the same" to such members or families of the Tribes *"as are willing to avail themselves of the privilege,* and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable." [14] (Emphasis supplied).

Defendant's argument that there was, in 1855, an agreement to a subsequent diminution of the Flathead Indian Reservation, by the sale of "surplus lands", has no merit. An equivocal allusion, in Article VI of the Treaty of Hell Gate, to the Treaty with the Omahas could scarcely have been understood to, and does not, negate the express provisions of Article II, providing that a Reservation be set apart, surveyed and marked out for the exclusive use and benefit of plaintiffs, with the white man allowed to reside thereon only by permission of the Indians. See Squire v. Capoeman, 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956); Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213 (1938).

Article VI of the Treaty of Hell Gate, even considered alone, reflects no agreement for, or intent to authorize, the sale of "surplus lands". *Cf.* Citizen Band of Potawatomi Indians of Oklahoma v. United States, 391 F.2d 614, 179 Ct.Cl. 473 (1967), cert. denied, 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839

(1968); Finding 17. Subsequent disposition of a portion of plaintiffs' Reservation is not even hinted at. It is clear that plaintiffs did not consent to the opening of the Reservation and the sale of surplus lands in 1855, nor, for that matter, at any time thereafter. Finding 4(c).

### III

While there is accord concerning the stipulated value of the "subject lands" there are disparate approaches to the problem of converting the stipulated value into fair market value and there is great divergence over what is such fair market value. Section I, *supra.*

Prior to agreeing upon the stipulated value, both plaintiffs and defendant presented extensive valuation evidence. Both plaintiffs' appraiser and defendant's appraiser were eminently qualified. Both recognized that determination of fair market value was exceedingly difficult. Not surprisingly, especially in view of the inadequate data available and the fundamental nature of the inquiry involved (Findings 26, 31(a)), there was "widely divergent opinion testimony * * *" as to fair market value. United States v. Northern Paiute Nation, 183 Ct.Cl. 321, 346, 393 F.2d 786, 800 (1968).

Plaintiffs, relying primarily upon 1910 Census data, contend that fair market value is 10 percent below the stipulated value. The testimony and approach of plaintiffs' appraiser on which this contention rests, are set forth in Findings 26–29, and not repeated here. As the Findings reflect, his opinion of fair market value is neither persuasive nor reasonable.[15]

Defendant's appraiser used a different approach, detailed in Findings 30–32. After first arriving at an opinion as to January 1, 1912, value,[16] from sales

14. The Treaty of March 16, 1854, with the Omahas, 10 Stat. 1043, 1044–1045, is quoted in pertinent part in Finding 2(d).

15. Sac & Fox Tribe of Indians of Okl. v. United States, 340 F.2d 368, 372, 167 Ct. Cl. 710, 718 (1964), noted by plaintiffs in connection with the Census data ap-

proach to fair market value, in fact turned on other, "substantial", evidence of the value of improvements. *Id.,* 340 F.2d at 372–373, 167 Ct.Cl. at 718–719.

16. Nearly, but not precisely, the stipulated value.

464

studied, of the "subject tracts" by class (*i. e.*, agricultural, grazing, timber, villas, and townsites), he then concluded in substance that he should "knock off" 50 percent of the value of the agricultural lands, and 25 percent of the value of the grazing lands, to arrive at fair market value. Findings 30, 31. In dollars, his opinion was that the value of the "subject tracts" as of January 1, 1912, some $8,952,000, should be reduced by $3,052,000, to eliminate from the larger figure the element of "improvements". Thus, fair market value was, in his opinion, only $5,900,000.

 In the abstract, the approach of defendant's appraiser to the problem of eliminating from his gross value opinion the element therein attributable to improvements seems clearly preferable to plaintiffs' reliance upon Census data. But, the difficulty with the opinion of defendant's appraiser is that, on the record before the court, it too is unpersuasive; it is plainly excessive by a considerable amount. Findings 30–32.

In sum, neither appraiser satisfactorily solves the problem of fair market value. Nor does the record permit any precise mathematical calculation of the extent to which the stipulated value exceeds fair market value. From a consideration of the record as a whole, including such evidence as it contains with respect to the factors enumerated in Finding 32, it is found that on January 1, 1912, the fair market value of plaintiffs' lands disposed of by the United States pursuant to the 1904 Act was $1,500,000 less than the stipulated value of $8,910,000 or $7,410,000. *Cf.* United States v. Northern Paiute Nation, *supra*; Nez Perce Tribe of Indians v. United States, 176 Ct.Cl. 815, 824 (1966), cert. denied, 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967); Sac & Fox Tribe of Indians of Okl. v. United States, 340 F.2d 368, 374, 167 Ct.Cl. 710, 721–722 (1964).

IV

Whether plaintiffs' lands disposed of by defendant pursuant to the 1904 Act were taken, within the meaning of the Fifth Amendment, requires focus upon the several sorts of dispositions involved.

(a) SCHOOL LANDS

In Three Affiliated Tribes of Fort Berthold Reservation v. United States, 390 F.2d 686, 182 Ct.Cl. 543 (1968) (hereinafter *"Three Affiliated Tribes"*) the United States "purchased certain lands from the tribe, pursuant to an act of Congress, granting such lands to the State of North Dakota for school purposes * * *", paying therefor a statutory price of $2.50 per acre. *Id.*, 390 F.2d at 688, 689, 182 Ct.Cl. at 548, 550. The court held that "a taking [of these school lands] did occur for which appellant is entitled to just compensation, including interest, subject, of course, to an offset for the amount already received." *Id.*, 390 F.2d at 694, 182 Ct.Cl. at 558.

By the 1904 Act, 60,843.04 acres of plaintiffs' land were "hereby granted" to the State of Montana for school purposes, at a statutory price of $1.25 per acre. Findings 7, 21. Insofar as these school lands are concerned, the present case and *Three Affiliated Tribes* are admittedly indistinguishable.[17] Accordingly, it is held that defendant took plaintiffs' lands granted to the State of Montana for school purposes.

(b) THE NATIONAL BISON RANGE

Defendant reserved to itself, from plaintiffs' "unallotted lands", some 18,523.85 acres of land for a "permanent national bison range", Congress having authorized such a reservation and appropriated $30,000 to pay "the appraised value of said lands". Finding 15.[18]

17. Defendant's Brief on the Question of Taking, pp. 14, 15. *Cf.* Section IV(c), *infra.*

18. The appropriating act (enacted some months prior to completion of the classification and appraisal of plaintiffs' lands)

The appraised value of lands so reserved was $28,955.48, or approximately $1.56 per acre.

Plaintiffs contend that they are entitled to just compensation for the lands so reserved. Defendant's Brief on the Question of Taking does not specifically meet this contention. It is clear that, in reserving to itself plaintiffs' lands, for a permanent national bison range, for "just the figure Congress wanted to pay", defendant "was exercising its power of eminent domain * * *." *Three Affiliated Tribes, supra,* 182 Ct. Cl. at 559; see also United States v. Southern Ute Indians, *supra,* 423 F.2d 346, 360–361, 191 Ct.Cl. 1, 26–28; Sioux Tribe of Indians v. United States, 316 U.S. 317, 326, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), and cases there cited. That plaintiffs received some compensation is irrelevant.

### (c) OTHER LANDS IN SUIT

Pursuant to Section 12 of the 1904 Act, defendant reserved 1,757.09 acres of plaintiffs' land for various public, charitable, and other purposes. Findings 15, 21. Defendant does not dispute that, under *Three Affiliated Tribes,* "a Fifth Amendment taking is established" as to this acreage.[19] It is so held.

### (d) THE LANDS PATENTED TO SETTLERS

The 1904 Act required that allotments be made to all members of the Tribes. It also required, after completion of the allotment process, that a five-man commission be appointed to classify plaintiffs' unallotted lands as agricultural land of the first class, agricultural land of the second class, grazing land, timber land, and mineral land, and to appraise the lands so classified (excepting mineral lands), by "the smallest legal subdivisions of forty acres each * * *." Lands classified as agricultural and grazing were then to be opened to settlement and entry, at appraised prices.

The allotment process was completed during fiscal year 1908. Allotments were made to some 2,390 Indians. Those allotted lands classified as agricultural received an allotment of 80 acres, and those allotted lands classified as grazing received an allotment of 160 acres. Plaintiffs' remaining lands were then classified and appraised by the commission,[20] and the lands classified as agricultural and grazing were, in 1910, opened to settlement and entry at appraised prices.[21]

In *Three Affiliated Tribes,* where Indian lands were entered by white settlers under appraised values, the court held that there was no taking, within the meaning of the Fifth Amendment, but, on the facts of that case, simply an exercise of defendant's "plenary" power to control and manage Indian property in good faith for the welfare and betterment of the Tribes.

While defendant takes some issue with *Three Affiliated Tribes* in other respects (Sections IV(a), (c), *supra*), it argues that the conclusion there that tribal lands patented to settlers were not taken governs here. Defendant "can conceive of no clearer similarity than the two cases", dismissing as "distinctions with-

---

contemplated a reserve of no more than 12,800 acres. The National Bison Range limits were subsequently enlarged to a maximum of 20,000 acres, without additional appropriation.

19. Defendant's Brief on the Question of Taking, pp. 14–15. Defendant does assert that, as to both these sorts of reserves and school lands, *Three Affiliated Tribes* was erroneously decided. The claim of error has no substance.

20. Generally speaking, the prices set by the commission ranged from $1.25 per acre for grazing land to $7.00 per acre for first class agricultural land south and east of the Flathead River. In the commission's view, approximately 80 percent of the unallotted lands classified and appraised were either grazing lands or lands of "no present market value." Finding 16(b). Payment terms to settlers are set forth in Finding 8.

21. The work of the commission was performed between November 8, 1907 and November 7, 1908.

out a difference" claimed dissimilarities between the two.[22] Plaintiffs contend that, under *Three Affiliated Tribes,* and other authorities, *their* lands disposed of to white settlers were taken. They also contend, alternatively, that the court erred "in holding that tribal lands taken through homestead entry were not taken in violation of the Fifth Amendment * * *," but that this alternative contention need not be reached.[23]

Plaintiffs' alternative contention can be, and is, pretermitted. For, as plaintiffs assert, the facts and circumstances of this case require a holding that plaintiffs' lands patented to settlers were taken. *Three Affiliated Tribes, supra;* United States v. Southern Ute Tribe or Band of Indians, *supra,* 423 F.2d at 360–361, 191 Ct.Cl. at 26–28.

*Three Affiliated Tribes* came before the court on appeal from an interlocutory order, findings of fact, and opinion of the Indian Claims Commission,[24] without any exception to "the voluminous and well-detailed findings of the Commission." Brief for Appellant, Appeal No. 2–66, p. 2, note 1.

The record in that case reflected that members of the Three Affiliated Tribes had been allotted lands pursuant to an 1886 agreement; each member of the Tribes was ultimately authorized a minimum allotment of 80 acres. Commission Findings 7, 8, 11.[25] Unallotted tribal lands were held as a Reservation. Commission Findings 7, 8.

In 1909, a bill calling for the sale and disposition of the "surplus and unallotted" tribal lands was introduced in the House of Representatives. The Indians thereupon protested. Their protests did not go unnoticed. Commission Findings 12–14. Among other things, Congress decided that members of the Tribes should receive allotments (160

acres of agricultural, or 320 acres of grazing, lands) in addition to any allotment "heretofore made or which may be made under existing law", and prescribed generally the location of such allotments. Commission Finding 14; Act of June 1, 1910, 36 Stat. 455 et seq. Power and reservoir sites, and coal and other mineral lands, were specifically reserved.[26] Commission Finding 14. Congress also made detailed provisions (quite similar to those contained in the 1904 Act) for determining the "appraised price" at which the tribal lands would be made available to homesteaders. *Ibid.*

All of the foregoing "provisions were incorporated into the bill in an effort to meet the more serious objections of the Fort Berthold Indians * * *." *Ibid.* The tribal lands were then classified, appraised, and "sold", in several separate land offerings, with all of the net proceeds from the sales paid into the Treasury to the credit of the Tribes.

Scrutiny of the Act of June 1, 1910, *supra,* pursuant to which the Fort Berthold Indian Reservation was opened to white settlement and entry, and the decisions of the Commission and the court in *Three Affiliated Tribes,* reveal still other considerations of interest here.

First, *Three Affiliated Tribes* was decided abstractly, in the sense that neither the Indian Claims Commission nor the court had before it any evidence whatever of fair market value. See 16 Ind.Cl.Comm. 341, 372–73. The Commission said as much at one point: in further proceedings, "the ultimate issue will be whether or not in disposing of petitioner's surplus reservation land [sic] by opening them up for sale and entry to homesteaders, the United States did obtain for the benefit of petitioner tribes compensation for said lands com-

---

22. Defendant's Brief on the Question of Taking, pp. 11, 13.

23. Plaintiffs' Brief on the Question of Taking, pp. 3–4.

24. 16 Ind.Cl.Comm. 341.

25. The 1886 agreement was ratified March 3, 1891, with amendment; the Tribes consented to and accepted the amendment. Commission Finding 8.

26. Coal lands originally reserved were later opened to entry.

parable with their then fair market value * * *." *Ibid.*

Second, in addition to the provisions noted above, the 1910 Act required that surplus, unallotted and unreserved lands be classified and appraised in 160-acre tracts. The preservation of "the ruins of the Old Fort Berthold Indian village and the Indian burial grounds adjacent thereto" was guaranteed, and a tribal farm of 640 acres for the benefit of members of the Tribes authorized. Cancellation of an entry in the event of failure of an entryman to make payments when due, with the payments made to be forfeited and the land to be "again subject to entry * * * at the appraised price thereof", and reappraisal of lands "undisposed of" within four years after entry, were required. All timber lands were reserved as a tribal forest. The net proceeds of sale of tribal lands were to draw interest at the rate of 3 percent per annum. And, the net proceeds were not authorized to be expended for the benefit of others.[27]

With the Commission's findings and opinion and the 1910 Act before it, the court discussed at some length both defendant's plenary power to control and manage the property and affairs of Indians for their benefit and defendant's exercise of the power to take Indians' property, within the meaning of the Fifth Amendment to the Constitution. It was concluded that (*Three Affiliated Tribes, supra,* 390 F.2d at 691, 693–694, 182 Ct.Cl. at 553, 557):

> Where Congress makes a good faith effort to give the Indians the full

value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of a trustee * * *

\* \* \* \* \* \*

* * * it is the good faith effort on the part of Congress to give the Indians the full value of their land that identifies the exercise by Congress of its plenary authority to manage the property of its Indian wards *for their benefit.* Without that effort, Congress would be exercising its power of eminent domain by giving or selling Indian land to others, by dealing with it as its own, or by any other act constituting a taking.

\* \* \* \* \* \*

* * * The facts of this case establish that Congress was not taking Indian land and giving it to the settlers, but was making a good faith effort to transmute Indian property from land to money by giving the Indians the full money value of the land.

As the quoted language of the court reflects, the nub of the holding in *Three Affiliated Tribes,* insofar as homestead lands are concerned, is that, *on the facts of that case,* Congress had acted under its plenary power and in its fiduciary capacity as trustee for its Indian wards, in good faith and "for the good of the

---

27. While the 1910 Act tracks the 1904 Act opening the Flathead Reservation in some respects, there are many differences. *E. g.*, in the 1904 Act itself, no tribal reserves, mineral, timber, or otherwise, were authorized. *Cf.* Act of March 3, 1909, 35 Stat. 781, 796 (power sites and reservoir sites reserved). Allotments ("under the provisions of the allotment laws of the United States") turned out to be of only 80 acres of agricultural, or 160 acres of grazing, land. While cancellation and forfeiture of entry (and forfeiture of payments made) for nonpayment were provided for, re-entry for the benefit of

plaintiffs, and reappraisal of lands not disposed of, were not. Sale and removal of all merchantable timber was authorized. Timber lands could be "sold and disposed of", after the removal therefrom of the timber, as defendant saw fit. No provision for interest on the net proceeds of sale was made. *Cf.* Confederated Salish and Kootenai Tribes of Flathead Reservation, Mont. v. United States, 175 Ct.Cl. 451 (1966), cert. denied, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966). And, as will be seen, the net proceeds of sale could be, and were, spent to benefit non-Indians.

tribe",[28] merely to transmute tribal property from one form (lands) to another (money). *Cf.* United States v. Southern Ute Tribe or Band of Indians, *supra*, 423 F.2d at 360, 191 Ct.Cl. at 26.

There can be, and is, no doubt that the United States has broad "power to control and manage the property and affairs of its Indian wards in good faith for their welfare." Chippewa Indians of Minnesota v. United States, 301 U.S. 358, 375–376, 57 S.Ct. 826, 833, 81 L.Ed. 1156 (1937); see also Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States, 299 U.S. 476, 498, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *Three Affiliated Tribes, supra*, 390 F.2d at 690–693, 182 Ct.Cl. at 552–557.

This power may be exerted in many ways, and even in derogation of treaty provisions, but it is, nonetheless, not absolute. It is plainly subject to constitutional limitations, and it does not extend so far as to enable the United States, without rendering (or assuming an obligation to render) just compensation therefor, to appropriate tribal lands to its own purposes or use, or to hand them over to others, for that would be, not an exercise of guardianship, but an act of confiscation. United States v. Klamath and Moadoc Indians, 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); Chippewa Indians, etc. v. United States, *supra;* Shoshone Tribe, etc. v. United States, *supra*, 299 U.S. at 496–497, 57 S.Ct. 244; *Three Affiliated Tribes, supra*, 390 F.2d at 693, 694–695, 182 Ct.Cl. at 555–557, 559–560.

Plaintiffs' Reservation was opened to white settlement and entry in breach of treaty, and without the consent of the Tribes. Granting, as plaintiffs do, the power of the United States so to act, the crucial issue is whether defendant thereby engaged in "an exercise of guardian-

ship or management," for the good of the Tribes, or "an act of confiscation" constitutionally requiring that it pay just compensation. United States v. Shoshone Tribe, *supra*, 304 U.S. at 115–116, 58 S.Ct. 794, 82 L.Ed. 1213; Shoshone Tribe, etc. v. United States, *supra*, 299 U.S. at 497, 57 S.Ct. 244; United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935).

The facts of this case indicate that in disposing of plaintiffs' lands to settlers, defendant dealt with plaintiffs' property as if it were its own, subordinated the good of the Tribes to other considerations, and took the said lands in the constitutional sense. *Three Affiliated Tribes, supra*, 390 F.2d at 693, 695, 697–698, 182 Ct.Cl. at 557, 559, 563–564; United States v. Klamath and Moadoc Indians, *supra;* United States v. Shoshone Tribe, *supra;* United States v. Southern Ute, etc., Indians, *supra;* Shoshone Tribe v. United States, *supra. Cf.* United States v. Algoma Lumber Co., 305 U.S. 415, 420–421, 59 S.Ct. 267, 83 L.Ed. 260 (1939).

History teaches that, as the settlement and development of the West rapidly progressed, so did demands for the acquisition of Indian lands and resources for white use. See, generally, Cohen, Federal Indian Law, 114–17, 129–31, 773–77 (1958 ed.). As defendant candidly put it in 1908 (Finding 17), "conditions were altogether different [in 1855] from what they are today. The lands that were given[29] to you [in 1855] were of small value, and the settlers were [then] few. Now, however, the people have increased in numbers, and they must have land in order to live and support their families. You and I must bow to the laws which Congress in its wisdom sees fit to enact."

Toward the end of the nineteenth century, the United States undertook to,

---

28. Chippewa Indians of Minnesota v. United States, 88 Ct.Cl. 1, 35–36 (1938), affirmed 307 U.S. 1, 59 S.Ct. 687, 83 L.Ed. 1067 (1939).

29. The Treaty of Hell Gate was, of course, "not a grant of rights to the Indians, but

a grant of rights from them—a reservation of those not granted." United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905).

and for a considerable period of time did, negotiate with plaintiffs for "such modification of existing treaties as may be deemed desirable by said Indians" and defendant. Act of June 10, 1896, 29 Stat. 321, 341–342. These efforts, aimed at obtaining an agreement of cession of parts of plaintiffs' Reservation, terminated in 1901, without any success. Then, by the 1904 Act, defendant simply opened plaintiffs' Reservation to white settlers, without the consent of the Tribes and in breach of treaty.[30]

*En passant*, the bill which ultimately became the 1904 Act originally contained a section providing "for the consent of the Indians to the provisions of the bill before the same shall become effective"; this section was subsequently stricken, there being "no occasion for presenting the matter to the Indians for the purpose of procuring their consent thereto." S.Rep.No.1930, 58th Cong., 2d Sess. (1904).

The 1904 Act and the opening of the Reservation thereunder had various sorts of impact on defendant's wards. Of particular present relevance is that, for some 485,000 acres of tribal lands (including some 404,000 acres patented to homesteaders), plaintiffs have received approximately $1,344,000 (including some $1,225,000 attributable to the homestead lands).[31] Even defendant concedes that these lands had a fair market value, on the stipulated date of valuation, of at least $5,900,000,[32] and the record establishes that, in fact, the "sub-

ject lands" had a fair market value on January 1, 1912, of $7,410,000.

"A necessary corollary to a mere change in the form of property is that both forms have the same, or at least nearly the same, value." *Three Affiliated Tribes, supra,* 390 F.2d at 695, 182 Ct.Cl. at 560. The notion that "there can not be a constitutional taking of lands as long as the United States had paid the Indians for such lands, regardless of the amount of the payment", has been emphatically rejected. *Three Affiliated Tribes, supra,* 390 F.2d at 695, 182 Ct.Cl. at 559. There is no real distinction "between no compensation, minimal compensation, or compensation arbitrarily determined." *Ibid.*[33] From the valuation evidence in this case, there is at the very least grave doubt as to "a good faith effort to give the Indians the full value of the land"; "a mere substitution of assets or change of form"; and the exercise, in good faith and for the welfare of the Tribes, of a "traditional function of a trustee." *Three Affiliated Tribes, supra,* 390 F.2d at 691, 182 Ct.Cl. at 553. The cited decision teaches that confiscation, and not guardianship, lies this way. *Cf.* United States v. Creek Nation, *supra.*

In determining whether the 1904 Act "dealt with [plaintiffs'] land as [defendant's] absolute property,"[34] it is even more significant that Congress, in authorizing the disposition of plaintiffs' tribal lands to homesteaders, also authorized the expenditure of the proceeds

---

30. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) had in the meantime explicitly declared the existence of Congressional power to abrogate Indian treaties. See Finding 17.

31. For their lands opened to settlement and entry, plaintiffs received about $3.03 per acre. In the opinion of defendant's appraiser, the approximate average fair market value of plaintiffs' agricultural lands was $16 per acre; his opinion for grazing lands was $10 per acre. Those opinions are, parenthetically, considerably on the low side. Findings 32(c), 33.

32. See Finding 30.

33. As the court noted, in United States v. Creek Nation, *supra,* the Supreme Court held that disposition of Indian land without assuming an obligation to render just compensation was confiscation, not guardianship, distinguishing between the two "by pointing out that control over Indian property in a guardian-type capacity includes the obligation to pay the full value for the property." *Three Affiliated Tribes, supra,* 182 Ct.Cl. at 556, 390 F.2d at 693.

34. United States v. Southern Ute, etc., Indians, *supra.*

of those lands *"for the irrigation of the irrigable lands* embraced within the limits of said reservation * * *." Act of May 29, 1908, 35 Stat. 444, 450.[35] Indeed, the authority of the Secretary of the Interior in this respect was without demonstrable limitation. Finding 12(b). And, it is not questioned that defendant in fact did utilize the proceeds derived from plaintiffs' lands for the construction of an irrigation system of benefit to white settlers. Such action was manifestly the assertion of an unqualified power of disposal of tribal assets, and is inconsistent with a good faith effort to give the Indians the full money value of their land. United States v. Southern Ute, etc., Indians, *supra; Three Affiliated Tribes, supra.*[36]

While not controlling, other considerations also suggest "confiscation", rather than guardianship or management of plaintiffs' property in good faith for their benefit. *Inter alia,* the absence of any provision for tribal reserves, particularly of timber; a transmutation of productive Reservation lands (see Findings 19–20) into money, with no provision in the 1904 Act for interest; disposition of plaintiffs' lands at appraised prices reached in 1907–1908 at an average date (as stipulated to by the parties) more than three years thereafter; and an authorization for disposition to non-Indians, without reappraisal, of all lands subject to entry not disposed of within "five years from the taking effect of this Act," seem outside the latter mold.

Plaintiffs would additionally advance a plethora of heretofore unmentioned contentions claimed to reflect spoliation and confiscation for the benefit of whites: that the 1904 Act was designed to "bust up" the Tribes as an entity; that *all* unallotted tribal lands were to be disposed of to third parties; that under the 1904 Act members of the Tribes were forced to take allotments, and were frequently given neither advance notice of the allotment process nor a choice of selection; that Indian ranches were destroyed, large herds of livestock had to be sold, families were separated by noncontiguous allotments, and allotments neither beneficial nor capable of supporting the allottee were made; that the Tribes' "hunting and fishing paradise" was seriously damaged, and a major portion of plaintiffs' subsistence was impaired if not destroyed; that by establishing artificial classifications of land, and by requiring classification and appraisal in 40-acre subdivisions, Congress was in effect legislating an "appraised price" (and thereby taking); that delayed payment terms available to homesteaders [37] precluded plaintiffs from receiving even the "appraised price", much less fair market value; that, by the Act of April 12, 1910, 36 Stat. 296, 297, defendant "intentionally sought to remove from Indian ownership [allotted] lands which could be irrigated"; [38] that

---

35. In the 1904 Act as originally enacted, expenditures for the construction of irrigation ditches for *plaintiffs'* benefit were authorized. Defendant's August 1, 1908, response to protests over the opening of the Reservation, though some months after this marked change, summarizes the disposition provisions of the 1904 Act as originally enacted.

36. The expenditure of tribal funds for construction of an irrigation system of benefit to white settlers was eventually rectified, and defendant argues that plaintiffs received a "double benefit" from the use of the proceeds of sale of their lands for the benefit of others, because "irrigation money was later returned to them in full with interest" and their own allotments, if irrigable, were benefited. The argu-

ment lacks any persuasive force. Post-taking measures can perhaps ameliorate, but clearly can not eradicate, an act of confiscation. United States v. Klamath and Moadoc Indians, *supra*. The so-called "double benefit" is, moreover, illusory.

37. See Finding 8. Compare Pawnee Indian Tribe of Oklahoma v. United States, 301 F.2d 667, 157 Ct.Cl. 134, 139, cert. denied, 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498 (1962), (overruling Miami Tribe of Oklahoma v. United States, 281 F.2d 202, 150 Ct.Cl. 725, 735 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961).

38. Plaintiffs' Brief on the Question of Taking, p. 28. The 1910 Act authorized the Secretary of the Interior, upon applica-

members of plaintiffs received only small allotments (80 or 160 acres, depending on the nature of the land allotted), whereas the impact of the allotment scheme on members of the Three Affiliated Tribes was mitigated by larger allotments (in addition to previous allotments, 160 or 320 acres, depending on the nature of the land allotted); and that the foreseeable end of the 1904 Act was only benefit to homesteaders, not Indians.

Defendant does not really meet any of these contentions in its argument, simply characterizing some as exaggerated, immaterial, or "distinctions without a difference". Save to the limited extent they are treated in the Findings of Fact, they are not here reached, for detailed discussion of them is unnecessary to the proper disposition of this aspect of the litigation. *Cf.* Lone Wolf v. Hitchcock, 187 U.S. 553, 567–568, 23 S.Ct. 216, 47 L.Ed. 299 (1903).

For the reasons heretofore indicated, it is concluded that, on the facts of *this* case, Congress was not making a good faith effort to transmute Indian property from land to money by giving the Indians the full money value of the land, but took those lands disposed of by patenting to settlers, in the constitutional sense.

▪ Plaintiffs also contend that while the "date of taking for all homestead and cash entries should be set as of January 1, 1912," in accordance with stipulation, the "date of taking [of all *other* lands in suit] is the date title was transferred." [39] Plaintiffs' contention has no merit.

The record does reflect fair market value as of January 1, 1912, the stipulated "critical date of valuation of *all* lands sued upon in this case" (emphasis supplied), but there is a total absence of proof of fair market value of any lands as of "the date title was transferred" [40] unless the date of transfer of title happened to be January 1, 1912. Moreover, plaintiffs' contention is patently inconsistent with their 1966 stipulation, pursuant to which an expensive and time consuming trial has been conducted. In the premises, there is no valid basis for determining the fair market value of some of the lands in suit at a different time.[41]

The suggestion that allowance of interest on the value of all lands taken (except lands patented to settlers) from the date title was transferred "comports" with *Three Affiliated Tribes, supra,* is specious. While the court did there hold, *inter alia,* that the proper *valuation date* for certain lands was the date on which title passed, that case did not involve any "question of selecting an average date of valuation for * * * lands taken on varying dates." 390 F.2d at 700, 182 Ct.Cl. at 568.

Having stipulated to an average date of valuation for *all* lands "to avoid burdensome detailed computation of value as of the date of disposal of each separate tract",[42] plaintiffs (and defendant) are bound by it. The "date of taking" of all lands in suit is January 1, 1912.

---

tion, to sell and dispose of up to 60 acres of a tribal member's allotment if the land was "or may be irrigable * * *." See Finding 14.

39. Plaintiffs' Supplemental Proposed Findings of Fact, p. 26.

40. Plaintiffs' appraiser defined the appraisal problem, to which the 1968 trial was directed, as an appraisal of "approximately 4,500 individual relatively small acreages sold by the Government over the years from 1910 through the final entries in 1935, *plus other lands*, with a stipulated date of value on January 1, 1912"

(emphasis supplied); defendant's "Appraisal of 4,838 parcels on Flathead Reservation, Montana, as of January 1, 1912" reflects an opinion of the value of all of the parcels "as of the appraisal date, regardless of the actual date on which [each] was sold."

41. If plaintiffs ask that fair market value be determined as of January 1, 1912, but that interest run from another date, they are still on unsound ground.

42. Creek Nation v. United States, 302 U.S. 620, 622, 58 S.Ct. 384, 82 L.Ed. 482 (1938).

## VI

Finally, plaintiffs claim that their recovery should include interest, not as interest but as a part of just compensation, at the rate of 5 percent per annum from "the date of taking" (Section V, *supra*) to July 1, 1934; at the rate of 4 percent per annum from July 1, 1934 to May 31, 1959; and at the rate of 6 percent per annum thereafter. Recovery should include interest at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934. Uintah and White River Bands of Ute Indians v. United States, 152 F.Supp. 953, 139 Ct.Cl. 1, 11–12 (1957), and cases there cited. From January 2, 1934, to the date of payment, recovery should include interest at the rate of 4 percent per annum.

This necessarily rejects plaintiffs' position concerning a proper rate of interest for the period June 1, 1959, to date of payment. Their precise contention is that just as a change in circumstances in 1934 justified a reduction in interest rates, circumstances "have changed again and this Court should so recognize"; that interest rates "have been up for some time"; and that Indians "can and do invest their money in Treasury notes at rates of interest as high as 6%." [43] Nothing in the record justifies the argument, nor, in any event, have plaintiffs proven a proper date of change in rate. On this record, the "recognition" plaintiffs seek would be improper.

### Conclusion

For the lands taken by defendant, within the meaning of the Fifth Amendment, plaintiffs are entitled to recover the difference between the fair market value of the said lands as of January 1, 1912 ($7,410,000) and the compensation therefor previously received by plaintiffs ($1,343,331.22), or a total of $6,066,668.78, plus interest thereon, not as interest but as a part of just compensation, at the rate of 5 percent per annum from January 1, 1912, to January 1, 1934,

and at the rate of 4 percent per annum thereafter until paid.

## FINDINGS OF FACT

The court, having considered the evidence, the report of Trial Commissioner Harry E. Wood, and the briefs and arguments of counsel, makes findings of fact as follow:

1. (a) This claim (Paragraph 10 of the petition, as amended) is one of several before the court pursuant to the Act of July 30, 1946, 60 Stat. 715, conferring jurisdiction upon the court "to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims of whatsoever nature which the Confederated Salish and Kootenai Tribes of Indians of the Flathead Reservation of Montana, or any tribe or band thereof, may have against the United States."

(b) The claim in Paragraph 10, as amended, is that the Flathead Indian Reservation "was opened by defendant by the Act of April 23, 1904, 33 Stat. 302, 3 Kapp. 79, without plaintiff's consent and over its objections", and that "Thereby plaintiff tribes became entitled to just compensation under the Fifth Amendment * * * for the lands disposed of pursuant to the statute." Plaintiffs seek to recover "the difference between the value of said lands at the time disposed of and the amount paid, together with damages for the delay in making payment of the full fair-market value of said lands."

2. (a) By the Treaty of Hell Gate, July 16, 1855, 12 Stat. 975, the Confederated Salish and Kootenai Tribes ceded to the United States a vast area of land, located within the present borders of the States of Montana and Idaho, theretofore held by aboriginal title.

(b) Article II of the Treaty of Hell Gate reserved from the lands ceded a tract of some 1,245,000 acres in northwestern Montana,

---

43. Plaintiffs' Brief on the Question of Taking, pp. 46–47.

All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said confederated tribes as an Indian reservation. Nor shall any white man, excepting those in the employment of the Indian department, be permitted to reside upon the said reservation without permission of the confederated tribes, and the superintendent and agent. * * *

The tract so reserved became known as the Flathead Indian Reservation.

(c) Article VI of the Treaty of Hell Gate provided that the President

may from time to time, at his discretion, cause the whole, or such portion of such reservation as he may think proper, to be surveyed into lots, and assign the same to such individuals or families of the said confederated tribes as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable.

(d) The Treaty of March 16, 1854, with the Omahas, 10 Stat. 1043, 1044, provided in part that certain lands were "reserved by the Omahas for their future home," and, in Article 6, that the President

may, from time to time, at his discretion, cause the whole or such portion of the land hereby reserved, as he may think proper, * * * to be surveyed into lots, and to assign to such Indian or Indians of said tribe as are willing to avail of the privilege, and who will locate on the same as a permanent home, if a single person

over twenty-one years of age, one-eighth of a section; to each family of two, one quarter section; to each family of three and not exceeding five, one half section; to each family of six and not exceeding ten, one section; and to each family over ten in number, one quarter section for every additional five members. * * * And the residue of the land hereby reserved, * * * after all of the Indian persons or families shall have had assigned to them permanent homes, may be sold for their benefit * * *.[1]

3. The Flathead Indian Reservation of Montana is located in the Northern Rocky Mountains, just west of the Continental Divide. In broad terms,[2] the northern boundary of the Reservation (from east to west) bisects Flathead Lake, a large body of navigable water some 30 miles long (north to south) and some 20 miles wide at its greatest width (within the lower or south half of the lake and within the Reservation). The eastern boundary is formed by the Mission Range of mountains. The southern boundary is formed by the Cabinet Range of mountains which extend northwestward to their intersection with the Flathead River, at which point the Cabinet Mountains run northerly to form the western boundary of the Reservation.

4. (a) Under authority contained in the Indian Appropriation Act for the fiscal year ending June 30, 1897 (Act of June 10, 1896, 29 Stat. 321, 341–342), a commission of three persons was appointed to negotiate with, inter alia, the Crow and Flathead Indians in Montana for the cession of portions of their respective Reservations, with any agreement thus negotiated to be subject to ratification by Congress.[3] During fiscal

---

1. A section contains 640 acres; a half section 320 acres; a quarter section 160 acres; and an eighth section 80 acres.

2. This description is intended only to indicate the geographic location of the Reservation generally, and not to affect boundaries not at issue under Paragraph 10. Cf. Confederated Salish and Kootenai Tribes of Flathead Reservation, Mont. v.

United States, 173 Ct.Cl. 398 (1965); Confederated Salish and Kootenai Tribes of Flathead Reservation, Mont. v. United States, 185 Ct.Cl. 421, 401 F.2d 785 (1968), cert. denied, 393 U.S. 1055, 89 S.Ct. 691, 21 L.Ed.2d 696 (1969).

3. The Act of May 15, 1886, 24 Stat. 29, 44, contained a similar authorization. There is, however, no evidence in the record of

year 1897, one or two members of the commission made short visits to the Flathead Reservation, but did little work there, and negotiated no agreement.

(b) The work of the commission was continued from year to year until June 30, 1901. Annual Reports of the Commissioner of Indian Affairs, Department of the Interior, for the fiscal years ended June 30, 1899, and June 30, 1901, reflect efforts by the commission to secure agreements with the Indians of the Flathead Reservation in Montana for the cession of portions of their reserve, and the inability of the commission to secure any agreement with the Flatheads for such cession.

(c) There is no evidence in the record that, at any time after 1855, the Indians of the Flathead Reservation consented to the opening of the Reservation and the sale of "surplus" lands.[4]

5. By the Act of April 23, 1904, 33 Stat. 302, "An Act For the survey and allotment of lands now embraced within the limits of the Flathead Indian Reservation, in the State of Montana, and the sale and disposal of all surplus lands after allotment", Congress directed the Secretary of the Interior to "immediately cause to be surveyed" the Reservation; Section 2 of the Act provided that " * * * so soon as all of the lands * * * shall have been surveyed, the Commissioner of Indian Affairs shall cause allotments of the same to be made to all persons having tribal rights with said confederated tribes * * * and such other Indians and persons holding tribal relations as may rightfully belong on * * * " the Reservation, "under the provisions of the allotment laws of the United States."

6. (a) Section 3 of the 1904 Act provided that "upon the final completion of said allotments to said Indians, the President * * * shall appoint a commission consisting of five persons to inspect, appraise, and value all of the said lands that shall not have been allotted in severalty to said Indians, * * * ", the commissioners to be two persons "now holding tribal relations with said Indians", two resident citizens of the State of Montana, and one "United States special Indian agent or Indian inspector of the Interior Department."

(b) Section 5 of the 1904 Act directed the commissioners to classify and appraise, by the smallest legal subdivisions of 40 acres each, all of the unallotted lands within the Reservation, dividing the lands to be classified and appraised into "agricultural land of the first class"; "agricultural land of the second class"; "timber lands" (lands more valuable for their timber than for any other purpose); "mineral lands";[5] and "grazing lands".[6]

7. Section 8 of the 1904 Act provided that, after classification and appraisement of the lands, "the land shall be disposed of under the general provisions of the homestead, mineral, and town-site laws of the United States, except * * * timber lands, and excepting sections sixteen and thirty-six of each township, * * * hereby granted to the State of Montana for school purposes." Section 8 also provided, in case "either of said sections or parts thereof is lost" to the State due to allotment, for the selection

---

negotiations with plaintiffs pursuant to the 1886 Act.

4. Defendant asserts that consent to the opening of the Reservation *vel non* is immaterial, but that consent was given by Article VI of the Treaty of Hell Gate, July 16, 1855, 12 Stat. 975, 977, Finding 2(c), *supra*.

5. Mineral lands "shall not be appraised as to value." Section 6, Act of April 23, 1904, 33 Stat. 302, 303. Only mineral

entry might be made on lands classified "as mineral under the general provisions of the mining laws of the United States * * *." Section 10, Act of April 23, 1904, 33 Stat. 302, 304.

6. Section 29, Act of June 25, 1910, 36 Stat. 855, 863, authorized the Secretary of the Interior to classify and appraise vacant, unallotted, and unreserved lands as "barren", "burned over", and "containing small timber".

of other lands not occupied in lieu thereof, with the United States to pay the Indians for school lands or "lieu" lands the sum of $1.25 per acre.

8. Section 9 of the 1904 Act, as amended by Section 15, Act of May 29, 1908, 35 Stat. 444, 448–450, provided that lands classified as agricultural and grazing "shall be opened to settlement and entry by proclamation of the President, * * *" and that the price of the said lands "shall be the appraised value thereof, as fixed by the said Commission * * *", to be paid "one-third * * * in cash at the time of entry, and the remainder in five equal annual installments, to be paid one, two, three, four, and five years, respectively, from and after the date of entry * * *." Section 9 of the 1904 Act further provided that homestead settlers might commute their entries "by paying for the land entered the price fixed by said Commission, receiving credit for payments previously made."

9. Section 11 of the 1904 Act, as amended by the Act of March 3, 1909, 35 Stat. 781, 796, provided that all merchantable timber on lands classified as timber lands should be sold and disposed of by the Secretary of the Interior for cash, under sealed bids or at public auction, and that, after the sale and removal of the timber, "such of said lands as are valuable for agricultural purposes shall be sold and disposed of by the Secretary * * * in such manner and under such regulations as he may prescribe."

10. Section 12 of the 1904 Act, as amended by the Act of March 3, 1905, 33 Stat. 1048, 1080–1081, "hereby granted" to certain eleemosynary institutions located on the Reservation 1,280 acres; "hereby granted" to the State of Montana 160 acres for biological station purposes; and authorized the President to "reserve lands * * * for * * * missionary or religious societies that may make application therefor within

one year after the passage of this Act * * * [and to] reserve * * * lands * * * for the occupation and maintenance of any and all agency buildings, substations, mills, and other governmental institutions * * *." [7]

11. Section 13 of the 1904 Act provided that all lands subject to entry "remaining undisposed of at the expiration of five years from the taking effect of this Act" were to be sold to the highest bidder, for cash, at not less than their appraised price.

12. (a) Section 14 of the 1904 Act provided that the proceeds of the "sale of said lands" would be paid into the Treasury of the United States and (after deduction of the expenses of the commission, of classification and sale of lands, and such other incidental expenses as might be necessarily incurred) would be expended or paid as follows: one-half for the benefit of "the said Indians * * * in the construction of irrigation ditches, the purchase of stock cattle, farming implements, or other necessary articles to aid the Indians in farming and stock raising, and in the education and civilization of said Indians, * * *" with the "remaining half to be paid to the said Indians * * * or expended on their account, as they may elect."

(b) By Section 15 of the Act of May 29, 1908, 35 Stat. 444, 450, Section 14 of the 1904 Act was amended to provide that the proceeds of the "sale of said lands" should be expended or paid as follows (emphasis supplied):

* * * So much thereof as the Secretary of the Interior may deem advisable in the construction of irrigation systems, *for the irrigation of the irrigable lands embraced within the limits of said reservation;* one half of the money remaining after the construction of said irrigation systems to be expended by the Secretary * * * as he may deem advisable for the benefit of said Indians * * * and the remaining half of said money to

7. Section 15 of the 1904 Act appropriated funds to pay for these (and school) lands at the rate of $1.25 per acre.

be paid to said Indians * * * semiannually * * * share and share alike * * *.

(c) Shortly prior to passage of the Act of May 29, 1908, *supra,* Congress had appropriated $50,000 for preliminary surveys, plans, and estimates of irrigating systems to irrigate both lands allotted to the Indians of the Flathead Reservation and unallotted irrigable lands to be disposed of under the Act of April 23, 1904, *supra,* "the cost of said entire work to be reimbursed from the proceeds of the sale of the lands within said reservation." Act of April 30, 1908, 35 Stat. 70, 83–84. In later acts (*e. g.,* Act of March 3, 1909, 35 Stat. 781, 795) Congress appropriated further funds for the construction of irrigation systems to irrigate both allotted and unallotted irrigable lands, with similar cost reimbursement language.

(d) Section 15 of the Act of May 29, 1908, *supra,* also amended Section 9 of the 1904 Act in pertinent part as follows: "the entryman or owner of any land irrigable by any system hereunder constructed under the provisions of section fourteen of this Act shall * * * be required to pay for a water right the proportionate cost of the construction of said system in not more than fifteen annual installments * * *."

(e) By the Act of May 18, 1916, 39 Stat. 123, 141, Congress provided that tribal funds theretofore covered into the Treasury of the United States in partial reimbursement of appropriations made for constructing an irrigation system on the Flathead Reservation "shall be placed to the credit of the tribe and be available for such expenditure for the benefit of the tribe as Congress may hereafter direct." By Section 5(a), Act of May 25, 1948, 62 Stat. 269, 272, Congress appropriated a total amount of $64,570.56, with interest, for unreimbursed balances spent from tribal trust funds for construction costs of the irrigation system, "the balance remaining due them under the Act of May 18, 1916 * * *".

13. (a) Section 17 of the 1904 Act, as added by the Act of June 21, 1906, 34 Stat. 325, 354–355, provided for the reservation and setting aside for "townsite purposes" of five plots of not less than 40 acres and two plots of not less than 80 acres, such plots to be surveyed, laid out and platted into town lots, streets, alleys and parks.

(b) Section 23 of the 1904 Act, as added by the Act of April 12, 1910, 36 Stat. 296, provided that unallotted lands fronting on Flathead Lake within the Reservation were to be surveyed and subdivided into lots of not less than two nor more than five acres in area, and sold to the highest bidder at public sale, subject to the right to reject all bids.

14. Section 24 of the 1904 Act, as added by the Act of April 12, 1910, 36 Stat. 296, 297, provided that, where allotments of lands made to "said Indians * * * within the area of said Flathead Indian Reservation * * * are or may be irrigable lands, the Secretary of the Interior may, upon application of the Indian allottee, sell and dispose of not to exceed sixty acres of such individual allotment of land * * *". While there is no specific evidence in the record as to the effect, if any, of this provision on plaintiffs, most of the irrigated lands of the Flathead Reservation have passed from the hands of Indians into those of others.[8]

15. By the Act of May 23, 1908, 35 Stat. 251, 267–268, Congress directed the President "to reserve and except from the unallotted lands now embraced within the Flathead Indian Reservation * * * not to exceed twelve thousand eight hundred acres of said lands * * * for a permanent national bison range * * *", and appropriated $30,000 to pay "the appraised value of said lands" determined pursuant to the Act of April 23, 1904, *supra.* The limits of the National Bison Range were subsequently enlarged so as to make the total acreage "not to exceed twenty thousand acres"; Congress directed that enough land be

8. See Cohen, Federal Indian Law, 251 (1942 ed.).

reserved and excepted from unallotted lands within the Reservation to enlarge such range accordingly. On June 10, 1909, the President approved a schedule reserving 18,523.85 acres for the National Bison Range. The appraised value of this land was $28,955.48.

16. (a) Pursuant to Section 2 of the 1904 Act (Finding 5, *supra*), the Commissioner of Indian Affairs caused allotments to be made to "all persons having tribal rights" with plaintiffs and "such other Indians and persons holding tribal relations as may rightfully belong on" the Reservation. The allotting work was completed during fiscal year 1908. See Finding 20.

(b) Pursuant to Section 3 of the 1904 Act (Finding 6, *supra*), a commission of five persons was appointed to classify and appraise the unallotted lands within the Flathead Indian Reservation. The commission began work November 8, 1907, and completed classification and appraisal of the said lands on November 7, 1908. The classifications made by the commission included 40,229.22 acres of agricultural land of the first class; 75,-019.78 acres of agricultural land of the second class; 336,189.15 acres of grazing land; and 59,061.71 acres containing "no merchantable timber" and being "unsuited for agriculture or grazing", of "no present market value". The latter acreage was classified as "Burned", "Barren", "Small Timber", "Rocky", etc., and appraised at a nominal value of from ten cents to $1.00 per acre. No lands were classified as mineral. Merchantable timber of a total value of $4,644,232 was reported. The commission appraised plaintiffs' unallotted lands as follows:

A. Land south and east of the Flathead River:
 First class agricultural _____ $7.00
 Second class agricultural _____ 3.50
 Grazing _____ 1.50

B. Land north and west of the Flathead River:
 First class agricultural _____ $5.00
 Second class agricultural _____ 2.50
 Grazing _____ 1.25

C. Certain exceptions:
 First class agricultural _____ $6.00
 Second class agricultural _____ 3.00
 Grazing _____ 1.25

17. At least some members of plaintiffs protested (without effect) the opening of the Reservation. By letter dated August 1, 1908, in response to a petition signed by 134 Indians, "no half breed", the Acting Commissioner of Indian Affairs stated, in part, that:

When Governor Stevens made his treaty with the Flathead, Kooenay, and Upper Pend d'Orielle Indians on July 16, 1855, conditions were altogether different from what they are today. The lands that were given to you were of small value, and the settlers were few. Now, however, the people have increased in numbers, and they must have land in order to live and support their families. You and I must bow to the laws which Congress in its wisdom sees fit to enact.

On January 5, 1903, the Supreme Court of the United States, which is the highest judicial body in our country, said that—

The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so.

On April 23, 1904, Congress decided that it was for the best interests of your Indians that the land in the Flathead reservation should be allotted to them, and that all lands left over should be opened to settlement by white people upon the proclamation of the President, and that of the money received for these lands, one-half should be used for paying the expenses of the allotment and sale, for constructing irrigation ditches, for purchasing stock, stock, cattle, farming implements, and other articles which will aid you in farming and stock-raising and in the education and civilization of your people; the remaining

half to be paid to all people having tribal rights on the reservation.

You will see, therefore, that while Congress believes that your lands should be opened so that their productive value can be utilized, it has directed that all the money received for the lands shall be used for the benefit of the Indians and has therefore taken nothing away from you.

This law of Congress is supreme, and you must accept that which it believes to be for your best interest. I have nothing to do with the making of law, and when Congress decides that certain things must be done, it is my duty to do them. I have therefore, under this Act, caused the lands to be surveyed and to be allotted to the Indians of the Flathead Indian reservation, and when the allotments shall have been finally completed the lands must be opened to settlement in accordance with the law.

In his letter of August 1, 1908, the Acting Commissioner of Indian Affairs did not allude to either the Act of April 30, 1908, *supra* (Finding 12(c)), or the Act of May 29, 1908, *supra* (Finding 12 (b)), amending the disposition of "the money received for the lands * * *."

18. By Presidential Proclamation dated May 22, 1909, (36 Stat. 2494) the President opened to settlement and entry, as prescribed in the Proclamation, all the non-mineral, unreserved lands classified as agricultural lands of the first class, agricultural lands of the second class, and grazing lands within the Flathead Indian Reservation. The opening of the Reservation was set for April 1, 1910, but in fact took place May 2, 1910.

19. (a) In a letter dated March 28, 1904, to a member of Congress, the Acting Commissioner of Indian Affairs stated that the Indians of the Flathead Reservation "are very far advanced in civilization and education. They have large herds of cattle, horses, and good, productive farms, raising great quanti-

ties of hay and wheat. Last year they raised over 1,000 tons of hay and 3,000,-000 pounds of wheat * * *."

(b) The Annual Report of the Commissioner of Indian Affairs, Department of Interior, for the fiscal year ended June 30, 1906, reflects that "the members of the tribes entitled on that [the Flathead] reservation are generally intelligent and progressive, having fixt abodes and many improvements; * * *."

(c) Several aged members of the Tribes, and several other witnesses, familiar with the Flathead Indian Reservation in or around the period 1908–1910, testified in this case before the late Commissioner Richard Arens on September 14 and 15, 1965, in Missoula, Montana, about life on the Reservation prior to allotment (completed in 1908) and opening (in 1910). Their testimony indicates generally that prior to allotment and opening, members of the Tribes raised cattle and horses (and goats), with herds of horses and cattle ranging from a few to as many as 3,000 head per family. Cattle and horses ranged freely over a considerable territory within the Reservation. There was plenty of water and grass "clear up to their knees."[9] At least some members raised hay and wheat, had an orchard, and cultivated a garden, and at least some Reservation land was fenced. The Reservation was a natural paradise for hunting and fishing. While one witness for plaintiffs testified that the range was free to everybody prior to the opening of the Reservation in 1910, there is an indication in the record that lands on the Reservation were leased by the Indians to white cattlemen prior to that time.

20. While the record is rather sparse in terms of what plaintiffs call the "evil effects" of the Act of April 23, 1904, *supra*, as amended, upon members of the Tribes, some broad conclusions as to the effects of the Act upon the members of the Tribes are possible.

9. Cf. note 11, *infra.*

Some 2,390 members of the Tribes were allotted lands by the end of fiscal year 1908 (80 acres if allotted lands classified as agricultural, and 160 acres if allotted lands classified as grazing). The allotments were involuntary, at least in the sense that whether or not the Tribes desired to maintain the Reservation as it had existed for about half a century was of no moment after enactment of the 1904 Act. Thereafter, the allotments were inevitable and in this sense "forced", but the record does not warrant the conclusion that members of the Tribes either had no advance notice of, or were deprived of a choice of selection in, the allotment process. The weight of such evidence as the record contains is to the contrary.[10]

Prior to the allotments, the Reservation consisted of approximately 1,245,000 acres. After the allotment process had been completed, approximately 1,000,000 acres remained to be "subject to entry under the homestead, mineral and townsite laws." There was thus a reduction at that time, in the acreage available to the Tribes as a whole, of approximately four-fifths of the total acreage of the Reservation.[11] Those members of the Tribes who maintained large herds of livestock were obviously drastically affected by the allotment process. Such herds could no longer be maintained, the allotments being too small to support them. On occasion, at least, allotments to members of the same family were not contiguous (for reasons not established by the record), and on occasion members of the Tribes were allotted lands supporting a growth of timber. It is a fair conclusion from the record as

a whole that the allotment process coupled with the coming of white settlers to the Reservation seriously affected the Tribes in terms of hunting and fishing rights, use of the open range for grazing, and the amount of land available to members of the Tribes for ranching.

21. On the basis of the Lee-Kenney Report, a land record study prepared jointly by two land record experts (Georgette B. Lee for plaintiffs, and John T. Kenney for defendant), plaintiffs and defendant are in agreement (with one exception noted) as to the amount and location of Reservation land disposed of by the United States pursuant to the Act of April 23, 1904, *supra,* as amended. A summary of such disposition, taken from the Lee-Kenney Report (with the exceptions indicated) is as follows:

| | No. of Parcels | No. of Acres |
|---|---|---|
| **Land Patented to Settlers** | | |
| Homesteads-normal [12] | 2,074 | 150,765.40 |
| Homesteads-cash [13] | 2,519 | 247,826.35 |
| Townsites and Villas | 45 | 5,374.86 |
| Mineral claims | 1 | 80.72 |
| | | 404,047.33 |
| **School Land Granted to State** | | |
| Place lands | 103 | [14] 50,097.14 |
| Lieu lands | 82 | 10,745.90 |
| | | 60,843.04 |
| **Public, Charitable and Other Dispositions** | | |
| National Bison Range | 1 | 18,523.85 |
| Churches and schools | 6 | 1,326.65 |
| Subagency reserve | 1 | 41.60 |
| Railroad selections | 1 | 228.00 |
| State selections | 1 | 160.84 |
| | | 20,280.94 |
| | 4,834 | [15] 485,171.31 |

10. Much of the more valuable land of the Reservation was allotted to members of the Tribes.

11. A large part of the Reservation was "forested and mountaintops * * * quite a lot of wasteland."

12. The "normal" method of obtaining a patent was by down-payment of one-third of the appraised value, with the remainder of the purchase price to be paid in five annual installments; in the meantime,

continuous residence, with cultivation, was necessary.

13. In lieu of the "normal" method, a settler, after fourteen months' actual and continuous residence and cultivation, could commute his entry by the payment of all unpaid money ("cash").

14. The Lee-Kenney Report includes under school land some 6,545.92 acres never surveyed, and thus still belonging to plain-

22. A General Accounting Office Report, dated May 21, 1953, reflects receipts and disbursements by the United States, as trustee, on behalf of plaintiffs pursuant to the Act of April 23, 1904, *supra,* as amended. The parties are agreed that the 1953 Report reflects credits or payments to plaintiffs pursuant to the 1904 Act, through June 30, 1951, in the following amounts:

| Source | |
|---|---|
| Sales of land to settlers | $1,225,199.24 |
| School (and other) lands | [16] 89,176.50 |
| National Bison Range | 28,955.48 |
| Total | $1,343,331.22 |

23. (a) The parties have stipulated "that for purposes of determining the fair market value of all of the lands made the subject of plaintiff's claim in Paragraph 10 * * * the critical date of valuation shall be January 1, 1912." The stipulation, " * * * entered into * * * so that the subject lands may be appraised and valued as of a single date, * * * shall serve to determine and fix the critical date of valuation of all lands sued upon in this case * * * * ".

(b) Following trial before Commissioner Arens [17] July 15–18, 1968, in Washington, D. C., as to the fair market value of plaintiffs' lands disposed of by the United States pursuant to the Act of April 23, 1904, *supra,* the parties stipulated in open court "that the total value of the subject tracts on January 1, 1912 *if no adjustment for improvements was made to the market data relied on,* would be $8,910,000." [18] (Emphasis supplied).

24. The evidence presented prior to the stipulation as to a fair market value of $8,910,000, unadjusted for improvements, on January 1, 1912 (hereinafter at times "the stipulated value"), included detailed studies concerning the lands; an analysis of data as to contemporaneous (1910–1916) sales within the Reservation itself by plaintiffs' expert witness as to fair market value (hereafter "plaintiffs' appraiser"), and an analysis of data as to contemporaneous (1906–1916) sales of lands on and surrounding the Reservation by defendant's expert witness as to fair market value (hereafter "defend-

---

15. The Lee-Kenney Report includes an additional 2,720 acres (McDonald's Lake Reservation and St. Mary's Lake Reservation) reserved from entry for plaintiffs' benefit, and thus still their property. Plaintiffs have excluded this acreage from suit. The Lee-Kenney Report also includes some 202.50 acres of timber reserves not shown to be lost and excluded *sua sponte.* See also Finding 23, note 18, *infra.*

16. As noted in Finding 21, *supra,* there is substantial agreement as to the acreage disposed of pursuant to the Act of April 23, 1904, *supra.* Defendant asserts elsewhere, however, that the credit of $89,-176.50 was "in payment for *71,341.20* acres of land set aside for school lands granted to the State of Montana and reserved for agency, school and mission purposes." The record does not explain the seeming discrepancy between this figure and those reflected in Finding 21.

17. Commissioner Arens presided at all trial sessions herein, and closed proof. *Cf.* Rule 147(b).

18. The parties also then stipulated that the total number of acres of land so disposed of was 487,776.7 acres. According to the Lee-Kenney Report, in effect stipulated to be accurate, 488,093.81 acres were so disposed of, in 4,838 parcels. Plaintiffs have since removed 2,720 acres of "land" from the claim, however, this acreage having been reserved from entry for the benefit of the Tribes, and admittedly not disposed of by defendant. Most of the 2,720 acres excluded is water, and plaintiffs assert (and defendant does not dispute) that this acreage does not affect any value determination. An additional 202.50 acres of timber reserves has also been excluded (see Finding 21, note 15, *supra*). Four parcels are involved in the excluded acreage. Plaintiffs claim 317.11 acres more than the acreage stipulated to in open court (after a reduction for the 2,922.50 acres mentioned above). Defendant does not insist on the stipulation in open court, and plaintiffs' acreage figures (modified by excluding timber reserves) have been adopted (Finding 21, *supra*). The discrepancies in acreage have *de minimis,* if any, effect on the value stipulation and are disregarded herein.

ant's appraiser"). Despite differing approaches to the valuation problem, the two appraisers (both eminently qualified) reached conclusions as to fair market value from comparable sales so close as to permit agreement on the stipulated value.

While the parties sharply disagree as to amount, both agree that the stipulated value must be reduced to eliminate therefrom the element of "improvements". The valuation problem thus presented by the parties is the extent to which the stipulated value ($8,910,000) should be adjusted downward to eliminate therefrom "any existing improvements involved in sales used." [19]

25. Plaintiffs propose an adjustment of 10 percent of the stipulated value as a "conservative" discount factor for "improvements on the land," thus making the fair market value of the lands disposed of by the United States pursuant to the Act of April 23, 1904, *supra*, as of January 1, 1912, $8,019,000 ($8,910,-000 less $891,000). This proposed adjustment rests primarily upon analysis by plaintiffs' appraiser of 1910 Census data relating to farms and farm property for Flathead County, Montana.

26. (a) Prior to the establishment of Lake County, Montana, in 1923, a large part of the Flathead Indian Reservation was included in Flathead County, Montana.

(b) Plaintiffs' appraiser testified that the most reliable indication of value of "improvements on the land" would be records of the Assessor's Office, located in Kalispell, Flathead County, Montana. On endeavoring to review these records, however, he found that a year or two earlier they (and other old records) had

been discarded as no longer needed, dumped into a trench, and covered with dirt. They were damaged by dirt and water, and irretrievably lost. Thus, he testified, it was impossible to get specific ratios of assessed values of improvements to land values.

(c) Plaintiffs' appraiser did review all "available market data on properties where improvement values were known or where statements had definitely been made that the land was unimproved," but concluded that the limited number of sales available for consideration "resulted in improvement value indications which were not conclusive because of the limited quantity of the data."

27. (a) The 1910 Census data on which plaintiffs' appraiser relied indicates that, in Flathead County, Montana, there were approximately 3,884,800 acres of land; [20] 239,445 acres of "Land in farms"; and 105,679 acres of "Improved land in farms".[21] The said 1910 Census data further reflects, for Flathead County, a total value, for farm "Land", of $9,519,600, and for farm "Buildings" of $1,460,245; the ratio between the value of farm "Buildings" and that of farm "Land" and "Buildings" combined is 13.3 percent.

(b) Using the foregoing ratio of value between farm "Buildings" and farm "Land" and "Buildings", and assuming that "half of all lands sold in the Reservation during the study period were as well improved as those covered by the census * * *", plaintiffs' appraiser concluded that a maximum discount of one-half of 13.3 percent, or 6.7 percent, "would be applicable to the subject lands for any existing improvements involved in sales used." For present pur-

19. The quotation is from the report of plaintiffs' appraiser; he also terms the adjustment a "necessary discount for improvement values in the sale properties." Defendant's appraiser refers to an adjustment to obtain "raw land value."

20. In the 1900 Census, agricultural data "for Indians on reservations [was] shown separately * * *" from agricultural data for counties in Montana. In the

1910 Census, however, such data was *not* separately set forth.

21. Plaintiffs define "Land in farms" and "Improved land in farms" by reliance upon excerpts from "Instructions and Schedules for the Census of Agriculture: *1920*." (Emphasis supplied). Similar instructions for the 1910 Census are not part of the record.

poses, plaintiffs have rounded off the discount to 10 percent. See Finding 25, *supra*.

28. (a) Plaintiffs' appraiser defined "improvements" as including "cultivation, fencing, buildings and wells and things of that kind", but, apparently, not "roads, or access on the land." [sic].

(b) Defendant's appraiser included, in his definition of "improvements", roads or access.

(c) "Instructions and Schedules for the Census of Agriculture: 1920" indicates that the value of farm "Land" should include the value of "all buildings and improvements attached to the land", and that the value of farm "Buildings" should reflect a "fair estimate of the present value of the farm buildings * * *."

29. On the record before the court, the opinion of plaintiffs' appraiser as to the adjustment required to eliminate from the stipulated value "any existing improvements involved in sales used" is neither persuasive nor reasonable. Plaintiffs' appraiser admitted that his definition of "improvements" included at least buildings, cultivation, fencing, wells, and the like, and it is reasonable to conclude that a road, or access, to land added an element of value to it. His opinion as to the necessary adjustment for improvements, however, was derived from a comparison of 1910 Census data concerning the "value" of farm "Buildings" and "Land" (including *all* "improvements attached to the land", assuming 1920 Census definitions can properly be utilized in analyzing 1910 Census data) with like data concerning the "value" of "Buildings" only.[22] Accordingly, the ratio thus derived from 1910 Census data affords no reliable or meaningful view of the ratio of *true* improvements to unimproved land values, and the opinion of plaintiffs' appraiser resting on that 1910 Census data and the assumption stated in Finding 27(b), *supra*, is neither reliable nor probative in determining the extent of "any existing improvements involved in sales used."

30. The report of defendant's appraiser[23] reflects an opinion as to the "effect of improvements on raw land value" as follows:

Adjustment in Farm Land Value to arrive at Raw Land Value:

| | | |
|---|---|---|
| Agricultural | 50% | of farmland |
| Grazing | 75% | of farmland |
| Timber | 100% | " |
| Villas | 100% | " |
| Townsites | 100% | " |

His "Final Value of Raw Land by Land Class" was as follows:

| | | | | |
|---|---|---|---|---|
| Agricultural | 125,653.54 | acres | $4,017,317.02 | @50%=$2,008,658.51 |
| Grazing | 314,065.26 | acres | $4,190,046.70 | @75%=$3,142,535.02 |
| Timber | 48,773.78 | acres | $341,416.46 | @100%= $341,416.46 |
| Villas | 4,048.35 | acres | $255,000.00 | @100%= $255,000.00 |
| Townsites | 1,112.70 | acres | $148,300.00 | @100%= $148,300.00 |
| Total | | | | $5,895,909.99 |

———◆———

His conclusion as to the fair market value of 4,838 parcels of land valued as "Raw Land as of January 1, 1912" (which he rounded to $5,900,000.00) reflects a discount for "improvements" of approximately 34 percent of the stipulated value.

31. (a) The report and testimony of defendant's appraiser indicate that the meager available data "gives credence

22. Plaintiffs' appraiser assumed, and plaintiffs argue, that "Buildings" is simply another word for "improvements", including both "buildings *and improvements attached to the land*" (emphasis supplied). The assumption is not a tenable one. If, as plaintiffs urge, 1920 Census definitions cited in support of the argument are applicable to 1910 Census data, those definitions refute it; if not, there is nothing in the record to support it.

23. The report encompassed 493,653.63 acres of "subject land" having (in the view of defendant's appraiser) a fair market value, unadjusted, of $8,952,000 as of January 1, 1912.

to the theory that land with fencing, roads, and various other types of improvements did sell for more than raw land", but that the "precise amount would be virtually impossible to calculate." He (and plaintiffs' appraiser as well) stated that the "improvements" problem was most difficult. There was in this case, he said, a "very hazy actual situation", requiring appraisal as of some fifty-five years earlier, in a "remote and undeveloped" area. In his opinion, the appraisal process could not be reduced to a "mechanical calculation": "I don't think that you can reduce this to precise figures." He testified that he could "prove this thing in four different ways"; that he could and did "prove to my satisfaction values that ranged over millions of dollars"; and that he could have "proved any one of those figures just as well as another, practically."

(b) In his opinion, the "truest evidence of value and the one considered most reliable is the average adjusted price of all the reliable sales found *on the reservation* from 1909–1916 * * * tempered to reflect my opinion of value * * *." (Emphasis supplied).

(c) On the basis of a "mass" of reading and documentation, he believed that most of the sales he had studied to arrive at an opinion as to unadjusted fair market value as of January 1, 1912, had involved land improved to a "greater or lesser degree." He also believed that substantially all of the land sales he had studied "had to have enough of improvements on [the land] to be proven up on." He gave some weight to the "fact" that the sales he had studied involved lands which "had been in private ownership for some period of time." [24] His conclusion was:

* * * So when all is said and done, what I am saying is, on the basis of what I have seen and read, I believe that most of these tracts were im-

proved to some degree. I think a man would pay more for a 40 acre tract that had been plowed or fenced or had a cabin or barn or a well or something on it than he would pay for the virgin land. * * * I believe on the basis of all that I could find, that probably the value of the raw land was doubled when it was up for resale.

* * * * * *

We had evidence it seemed to show that you could well have as much as $25 an acre in improvements in these sales * * * we came to a judgement [sic] figure that over all, taking the whole, probably half of a farm's value was the fact that it had been broken, and cultivated and had some kind of improvements on it. * * * we came to the conclusion that a piece of farm land was worth about twice as much as raw lands.

* * * * * *

I came to the conclusion * * * that the sales had a value of approximately double their raw land value as agricultural lands and that as grazing worth 75 percent as much * * * lands, the raw land was probably

* * * * * *

Admittedly, however, he "felt it needed courage to knock off 50 percent on the agricultural lands that I did, and 25 percent that I knocked off on the grazing lands."

32. (a) Defendant's appraiser indicated that most of the sales he had studied involved lands which had been improved to "some degree", or to a "greater or lesser degree," and that land might be plowed *or* fenced,[25] or might have a cabin, barn, *or* well on it. His utilization of an *average* discount of 50 percent for agricultural land, and 25 percent for grazing land, when considered in light of his emphasis of evidence that "seemed to show that you could well have as much as $25 an acre in improvements in these sales * * *",

---

24. He subsequently "thought", however, that he had studied and used sales of Reservation lands patented as early as 1910.

25. Partial cultivation, and partial fencing, of a tract were common.

reasonably justifies the conclusion that in reaching his opinion as to discount, *all* of the land sales he studied were considered as having extensive (if not maximum) improvements.[26] There is no evidence that all of the sales he studied involved improved lands, and there is evidence that the sales studied included lands having at most only a fence, a road, a road and fence, or other "improvements."

(b) At trial (and in his report) defendant's appraiser alluded to an average difference in selling price of $25.04 per acre between "property improved with buildings and/or cultivated land" and "bare land"; of $14.79 per acre between land with "access and fence" and bare land; of $5.72 per acre between land with "access" and bare land; and 19 cents per acre between land with "fence" and bare land. In a memorandum re contributory value of improvements prepared and submitted by him subsequent to trial,[27] however, average "differences" of $22.04, $12.67, $5.22, and 47 cents per acre, respectively, are shown. The small number of sales involved, and the considerable variations in price per acre[28] revealed by even those few sales, preclude the drawing of any accurate and meaningful conclusions from this data, but the discrepancies diminish the probative value of the opinion of defendant's appraiser. His opinion also failed to give consideration to the fact that a settler might (and many homesteaders on the Reservation did) "commute and receive his patent."

(c) In light of the record as a whole, it is found that the opinion of defendant's appraiser as to the adjustment required to eliminate from the stipulated value as of January 1, 1912, "any existing improvements involved in sales used" is (a) unpersuasive and (b) excessive by a considerable amount.

33. As both plaintiffs' and defendant's appraisers recognized, the discount problem is an exceedingly difficult one. Neither appraiser satisfactorily solves it. Nor does the record permit any precise mathematical calculation.[29] From a consideration of the record as a whole, including such evidence as it contains respecting the nature of improvements on the Reservation (and in Montana), during the period 1910–1916; the nature of plaintiffs' lands to be valued (agricultural, grazing, timber, and villas and townsites); the respective acreages of each type of land; the extent to which comparable land sales studied by the appraisers involved sales of improved lands, the element of value due to improvements in such sales, and the average length of time lands involved in such sales had been in private ownership;[30] it is found that the fair market value of the lands disposed of by the United States pursuant to the Act of April 23, 1904, *supra*, as of January 1, 1912, unimproved, was $1,500,000 less than the stipulated unadjusted fair market value of $8,910,000 or $7,410,000.

34. (a) While the Lee-Kenney Report reflects that "entry" of plaintiffs' lands began as early as 1903 and continued to at least 1932, the record contains no evidence as to the fair market value of plaintiffs' lands at any time other than January 1, 1912, the stipulated "critical date of valuation of all lands sued upon in this case * *."[31]

---

26. Plaintiffs' appraiser testified that a value of $25 per acre due to improvements was not possible. So high a figure was, if not impossible, in any event rare.

27. At the request of plaintiffs' counsel.

28. Prices for land "with improvements", for example, ranged from $14.38 to $118.-12 per acre.

29. Both appraisers were well-qualified. The basic problem is lack of adequate data, not expertise.

30. The evidence does not support any valid conclusions about the background and experience of homesteaders; their reasons for homesteading (that is, farming, land speculation, or otherwise); or the effect "speculative intent" might have on extent of improvements.

31. Plaintiffs' appraiser gave his opinion of the fair market value of "approximately 4,500 individual relatively small acreages sold by the Government over the years from 1910 through the final entries

(b) The stipulation of the parties as to the "total value of the subject tracts on January 1, 1912 * * * ", before adjustment for "improvements" encompasses all of the 4,834 parcels, and 485,-171.31 acres, of land plaintiffs lost. Finding 21, *supra*. Neither party has proposed any allocation of either stipulated value or fair market value of plaintiffs' said lands to lands patented to settlers (4,639 parcels, 404,047.33 acres); school lands granted to the State of Montana (185 parcels, 60,843.04 acres); and other dispositions (10 parcels, 20,280.94 acres). The record permits no reasonable allocation of fair market value to the respective types of dispositions.

## ULTIMATE CONCLUSIONS OF FACT AND LAW

35. (a) Plaintiffs' lands disposed of by defendant pursuant to the 1904 Act had a fair market value, as of January 1, 1912, of $7,410,000.

(b) While defendant controverts the *amount* of plaintiffs' recovery and denies that plaintiffs are entitled to any interest, it concedes their right to recover the difference between "fair market value of the subject lands * * * as of January 1, 1912" and "the amount realized therefor, namely, $1,343,331.22 * * *, without interest." [32]

(c) Plaintiffs' lands "hereby granted" to the State of Montana for school purposes (60,843.04 acres), reserved by defendant for the National Bison Range (18,523.85 acres), and otherwise disposed of by defendant (1,757.09 acres), as set forth in Finding 21, were taken by defendant, within the meaning of the Fifth Amendment. Plaintiffs are therefore entitled to recover the fair market value of the said lands as of January 1,

in 1935, *plus other lands*, with a stipulated date of value on January 1, 1912" (emphasis supplied); defendant's "Appraisal of 4,838 parcels on Flathead Reservation, Montana, as of January 1, 1912" also reflects an opinion of the value of *all* of the parcels "as of the appraisal date, regardless of the actual date on which [each] was sold."

32. Defendant's Brief on Valuation, p. 11.

1912, less compensation therefor previously received by plaintiffs, with interest thereon, not as interest but as a part of just compensation, at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934, and at the rate of 4 percent per annum thereafter until paid.

(d) Plaintiffs' lands patented to settlers (404,047.33 acres), as set forth in Finding 21, were taken by defendant, within the meaning of the Fifth Amendment. Plaintiffs are therefore entitled to recover the fair market value of the said lands as of January 1, 1912, less compensation therefor previously received by plaintiffs, with interest thereon, not as interest but as a part of just compensation, at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934, and at the rate of 4 percent per annum thereafter until paid.

(e) Plaintiffs have received, for the lands described in Findings 35(c) and (d), a total of $1,343,331.22.

36. Plaintiffs are entitled to recover $6,066,668.78, plus interest thereon at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934, and at the rate of 4 percent per annum thereafter until paid.

## CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, on the claim set forth in Paragraph 10 of the petition, as amended, $6,-066,668.78, plus interest thereon, not as interest but as a part of just compensation, at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934, and at the rate of 4 percent per annum thereafter until paid.*

* By order of the Court of April 23, 1971, judgment was entered for the plaintiffs, in the claim set forth in Paragraph 10 of the petition, as amended, in the amount of six million sixty-six thousand six hundred sixty-eight dollars and seventy-eight cents ($6,066,668.78), plus interest thereon, not as interest but as a part of just compensation, at the rate of 5 percent per annum from January 1, 1912 to January 1, 1934, and at the rate of 4 percent per annum thereafter until paid.